**SOUTH SHORE HOSPITAL, Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 79–1590.

United States Court of Appeals, First Circuit.

Argued May 6, 1980.

Decided Sept. 18, 1980.

Michael R. Brown, Boston, Mass., with whom H. Daniel Hassenfeld, and Herrick & Smith, Boston, Mass., were on brief, for petitioner.

Charles P. Donnelly, Atty., Washington, D.C., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D.C., were on brief, for respondent.

Before CAMPBELL and BOWNES, Circuit Judges, and DAVIS,\* Judge, U. S. Court of Claims.

LEVIN H. CAMPBELL, Circuit Judge.

South Shore Hospital has petitioned for review of a Board order and decision which found the Hospital had refused to bargain in good faith and had discriminated against unit employees by withholding a wage increase from them.

## I.

The pertinent events are largely undisputed. Since 1974, the Massachusetts Hospital Workers Union, Local 880, Service Employees International Union, AFL–CIO (the Union) has represented a unit of technical workers employed at the Hospital and has negotiated three collective bargaining agreements on their behalf. The technical workers, who comprise approximately 100 of the Hospital's 1,200 employees, are the only employees at South Shore represented by a union.

\* Sitting by designation.

On July 20, 1977, negotiations commenced for a collective bargaining agreement to replace the one due to expire on September 30, 1977. A total of 21 bargaining sessions were held over a nine month period, but no agreement was concluded and, insofar as appears, none has yet been reached. Effective October 1, 1977, all employees except those represented by the Union received a general wage raise ranging in amount from 3 percent to 8.3 percent and the Hospital absorbed an increase in Blue Cross–Blue Shield premiums for the non–unit employees.

The Union presented its demands to the Hospital prior to the first negotiating session, and the Hospital, at the second session on August 10, 1977, submitted to the Union a document containing the Hospital's proposals. The latter was neither a whole economic offer (it did not deal with wages, for example) nor a response to all of the Union's demands. Rather, it was thirteen seriatim proposals which, if accepted, would have changed and/or clarified prior contract language and, in a number of instances, reduced certain benefits employees had enjoyed under the previous collective bargaining agreement. Items the Hospital proposed included lengthening the probationary period for unit employees from 60 to 90 days; restricting certain overtime pay, including a limitation on the circumstances under which premium pay would be accorded employees called to work in advance of their regularly scheduled shift; replacing the former 75 percent reimbursement tuition assistance program with an unspecified percentage to be determined at the Hospital's discretion; requiring employees on unpaid leave of absence in excess of 30 days to pay their own health and life insurance premiums; and barring Union representatives from entering Hospital premises except to attend scheduled meetings with Hospital administration. The Hospital's proposals on overtime, leave of absence, and tuition assistance were in accordance with its stated policy of seeking to standardize benefits between unit and non–unit employees.

During the first eight months of negotiations, the Hospital took the position that the Union's non–economic proposals and the Hospital's initial proposals should be discussed and hopefully resolved before wages and other economic benefits would be addressed. Consistent with that stance, and despite Union requests, the Hospital repeatedly declined to discuss wages or to make a total economic offer. Indeed, the Hospital did not present a wage proposal until the eighteenth session on March 22, 1978, approximately nine months after negotiations had commenced. By then, both sides had made certain compromises which had led to agreement on many, but not all, of the Hospital's original proposals. Remaining unresolved were the Hospital's proposals on call to work, leave of absence, and access of Union representatives.

The Hospital's March 22 wage offer would have granted to unit employees the same wage and Blue Cross–Blue Shield premium benefits that had been accorded non–unit employees on October 1, 1977, but was not to be retroactive to that date. The Union, stating it would not agree to a contract leaving the members of the bargaining unit getting the same raise as everyone else only six months later, rejected the offer. Negotiations continued for three more sessions. The Union proposed to accept the wage and benefit offer (although not the three other unresolved proposals) provided the raised wages and benefits were made retroactive to October 1, 1977, but the Hospital stood fast on its refusal to accord retroactivity. Thus, agreement was not reached on wages, nor was agreement reached on the three remaining issues. On April 18, 1978, the parties agreed they had reached an impasse. Shortly thereafter, the Hospital implemented its last offer on wages, i. e., as of the end of April it commenced paying to Union members the wages and benefits earlier accorded non–unit employees.

In findings later upheld by the Board, the Administrative Law Judge (ALJ) stated: "I find and conclude that Respondent Hospital violated its statutory obligation to bargain in good faith with the Union by its repeated refusals during the course of some 18 bargaining sessions over an eight–month period to submit to the Union wage or economic counterproposals or to discuss with the Union wages or economic benefits. Respondent Hospital, during this extended period, persistently and adamantly refused to bargain in good faith with the Union over wages and economic benefits which had been proposed by the Union unless and until the Union agreed to reductions in certain existing employee benefits as proposed by the Hospital. Respondent Hospital, by its conduct, was not dealing with the Union 'in a serious attempt to resolve [their] differences and reach a common ground.' [Citation omitted.] Instead, . . . the Hospital was 'rigidly and unreasonably fragmenting the negotiations * *' and 'giving the Union the runaround while purporting to be meeting with the Union for purposes of collective bargaining.' [Citation omitted.]"

The ALJ went on to say,

"Thereafter, commencing March 22, Respondent Hospital persisted in its refusal to bargain in good faith, effectively rejecting any attempt by the Union to 'move the negotiations out of the almost deadlock they were in * * *.'"

Both the refusal to bargain over wages and other economic benefits prior to March 22 and the Hospital's bargaining conduct subsequent to that date were cited as violations of Sections 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5) and (1).

The Board also held that the Hospital violated Sections 8(a)(3) and (1) of the Act, 29 U.S.C. §§ 158(a)(3) and (1),[1] by "discrimi-

---

1. 29 U.S.C. §§ 158(a)(1), (3), and (5) provide, in material part

"It shall be an unlawful labor practice for an employer

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; . . . (3) by discrimination in regard to hire or tenure of employment or any term or condi-

natorily withholding from . . . unit employees from about October 1, 1977 to about April 24, 1978, the wage increases which were granted non–unit employees, in order to discourage their membership in [the Union]."

## II.

We address first the two section 8(a)(5) bad faith bargaining violations.

A. The Hospital maintains that it is customary negotiating procedure as well as desirable strategy[2] to dispose of non–economic issues before turning to the major economic matters, since a wage offer may operate to divert attention from the resolution of other matters. *See Federal Mogul Corp.,* 212 NLRB 950, 955 (Miller dissent) ("If the Union has won economic gains, it is not likely to be much interested in management's suggestions for revising such items as the transfer, layoff, grievance or leave procedure."), quoting from 1 B. Werne *Law and Practice of the Labor Contract* 223.

The Board, on the other hand, claims the Hospital's strategy unduly hampered the reaching of a collective bargaining contract since it is unrealistic to expect a union to agree to reductions of benefits enjoyed under a former contract without seeing an offer on wages and other economic benefits. Only in the context of a whole economic proposal can the Union assess its position and possibly agree to some reductions.

The Hospital's position that it is permissible to insist on piecemeal bargaining of the sort which occurred here has been rejected by the Board and courts. *Pillowtex Corp.,* 241 NLRB No. 6 (1979), *enf'd without published opinion, Pillowtex Corp. v. NLRB,* 615 F.2d 917 (5th Cir.1980); *Federal Mogul Corp.,* 212 NLRB 950 (1974), *enf'd, Federal*

*Mogul Corp. v. NLRB,* 524 F.2d 37 (6th Cir. 1975); *NLRB v. Patent Trader, Inc.,* 415 F.2d 190, 198 (2d Cir.1969), *modified on other grounds,* 426 F.2d 791 (1970) (en banc) (Board warranted in finding that employer's insistence on postponing, to the end of negotiations, discussion of wages and other fundamental economic benefits reduced flexibility and narrowed range of possible compromise with the result of rigidly and unreasonably fragmenting negotiations); *Adrian Daily Telegram,* 214 NLRB 1103 (1974).

The Board maintains that one party's requirement that specified items be resolved before proposals on major economic items are discussed has the potential of completely frustrating the bargaining obligation: negotiations may be effectively stalled before much substantive discussion ever takes place. Flexibility and hence an important avenue toward reaching agreement are said to be removed if adherence to a specified order precludes consideration of package proposals combining wage and other items.

■ Under the National Labor Relations Act, the Board is "authorized to order the cessation of behavior which is in effect a refusal to negotiate, or which directly obstructs or inhibits the actual process of discussion, or which reflects a cast of mind against reaching agreement." *NLRB v. Katz,* 369 U.S. 736, 747, 82 S.Ct. 1107, 1114, 8 L.Ed.2d 230 (1962). We think the present situation is one where the "question of good faith bargaining is for the Board's expertise more than ours." *Kellwood Co. v. NLRB,* 434 F.2d 1069 (8th Cir.1970), *cert. denied,* 401 U.S. 1009, 91 S.Ct. 1257, 28 L.Ed.2d 544 (1971). Hence, we conclude the Board exercised a permissible judgment in concluding that the duty to bargain in good faith imposed by Section 8(a)(5) of the Act, 29

tion of employment to encourage or discourage membership in any labor organization . . . . .

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

**2.** Managements have been advised that it "is best . . . not to talk wages or money

benefits until desired changes have been worked out on other aspects of the agreement . . . . . The agreement should be combed from top to bottom before there is a concession on money matters." *Federal Mogul Corp.,* 212 NLRB 950, 952 (1974) (Miller dissent), quoting from 1 B. Werne *Law and Practice of the Labor Contract* 223.

U.S.C. § 158(a)(5), was violated by the employer's repeated refusal in the circumstances that pertained here to discuss wages and major economic benefits unless and until other proposals calling for reductions in previously enjoyed benefits could be resolved.

The Hospital argues that a similar pattern had been followed in past negotiations and that, in any event, the Union had agreed at the outset that major economic items could be postponed until agreement on other matters was reached. However, the ALJ supportably concluded the Union did not agree to reach resolution on the Hospital's proposals as a precondition to discussion of the Union's demands. Chief Union negotiator Shea testified that Hospital spokesman Brown stated non–economic matters would be discussed, as usual, before economic ones and Shea responded that order was in general acceptable to the Union but that it might be necessary to mix economic and non–economic items toward the end of negotiations. While Alvin Topham, the Hospital's associate director, did not recall Shea's qualification, his testimony does not establish any hard and fast agreement as to the order of resolution. He testified

> "Mr. Brown [3] stated his understanding that the language issues and non–economic issues and some of the economic issues would be discussed first and, hopefully, resolved. And that the wages would be discussed later on in the session."

Even under the Hospital's version of events, there was no unequivocal pact to *resolve* non–wage items first, but only a loose agreement to *discuss* them first with a hope of reaching resolution before turning to wages. As time went on and agreement on the Hospital's proposed reductions had not been reached, the Union made it clear that it desired to know what the Hospital's wage proposals were.

██ Thus, on the present record, we conclude the Board's determination that the Hospital failed to bargain in good faith

from approximately September 16, 1977 to March 22, 1978 is supported by substantial evidence on the record as a whole.

B. A further question arises with respect to the Board's finding that the Hospital continued to violate Section 8(a)(5) by bargaining in bad faith *after* March 22, 1978. On that date the Hospital abandoned its refusal to make a wages and benefits proposal; it offered the same increases given on October 1, 1977 to non–unit employees, but declined to make these retroactive to the time increases were given to non–unit personnel. The ALJ did not describe the conduct after March 22, 1978 which he felt had violated Section 8(a)(5) other than to say,

> "[C]ommencing March 22, Respondent Hospital persisted in its refusal to bargain in good faith, effectively rejecting any attempt by the Union to 'move the negotiations out of the almost deadlock they were in . . . .'"

As best we can discern, the ALJ's objection to the Hospital's bargaining centered on its refusal to make its wage proposal retroactive to October 1, 1977.

██ Standing alone, an employer's refusal to budge on a wage offer would not be indicative of bad faith bargaining for the Act specifically provides that the obligation to bargain in good faith "does not compel either party to agree to a proposal or require the making of a concession," 29 U.S.C. § 158(d). Thus an employer's adherence to a particular otherwise lawful position, or its rejection of a union proposal, even though a deadlock is produced, is not unlawful so long as not motivated by a desire to thwart agreement or other improper purpose. *Glomac Plastics, Inc. v. NLRB*, 592 F.2d 94, 98 (2d Cir.1979); *NLRB v. Pacific Grinding Wheel Co.*, 572 F.2d 1343, 1348–49 (9th Cir. 1978). But the Board argues that the Hospital's otherwise lawful refusal to make its wage proposal retroactive was here tainted by an improper purpose to discourage union activity. According to the Board, when the Hospital's original piecemeal bargaining

---

**3.** Mr. Brown was the Hospital's chief negotiator.

strategy failed to extract concessions from the Union, the Hospital then took the discriminatory and punitive step of offering wage increases which, because coming later, would be less than those accorded unrepresented employees. In support, the Board points to a statement of Michael Brown, the Hospital's chief negotiator, made at the April 3, 1978 negotiating session, that the Hospital would have made its economic counterproposal last fall had the Union been agreeable to the Hospital's original proposals. The Board's argument, in other words, is that the Hospital, by refusing to embody in its final offer retroactivity to the proposed wage increase, was "discrimina[ting] in regard to . . . [a] term or condition of employment [i. e., wages] to encourage or discourage membership in any labor organization . . . ." 29 U.S.C. § 158(a)(3). So phrased, the second alleged section 8(a)(5) violation is ultimately the same as the alleged section 8(a)(3) violation, and we deal with it in the latter form, upholding the Board as to both types of violation.

### III.

With respect to the alleged Section 8(a)(3) violation, the ALJ and the Board concluded,

"Respondent Hospital's withholding of the [October 1, 1977] wage increases from the Union employees was in substantial part discriminatorily motivated and, consequently, violative of Section 8(a)(3) and (1) of the Act."

They went on to state,

"[The withholding action] cannot be justified as serving any legitimate interests of the Employer. This discriminatory conduct plainly had a natural and foreseeable effect of chilling employee desires for Union representation. Such conduct was intended to punish the unit employees because they had selected Union representation. Respondent Hospital there-

fore violated Section 8(a)(3) and (1) of the Act."

As the Board points out, absent unlawful motive, an employer, during the course of negotiations, does not violate the Act by withholding wage increases from represented employees. *Chevron Oil Co. v. NLRB*, 442 F.2d 1067, 1074 (5th Cir.1971). The determinative factor is thus motive.

The Hospital made it clear during negotiations, and does not now deny, that inability to pay was not the reason for its refusal to make its wage offer retroactive to October 1, 1977.[4] Rather, the Hospital's stated reasons were the Union's refusal in September 1977 to extend the existing collective bargaining contract—which refusal held open the threat of a Union strike[5] and led to the administrative dilemma of having no contract to utilize in dealing with employees—and the potential impact of granting retroactivity on future negotiations. The Hospital says it feared that according retroactivity after nine months of negotiations might prove a future disincentive to the prompt conclusion of a collective bargaining agreement.

 We have frequently held that the Board may not reject the employer's stated business reasons unless there is evidence from which it can reasonably be inferred that the true motivating reason lay elsewhere. *See, e. g., NLRB v. Eastern Smelting & Refining Corp.*, 598 F.2d 666 (1st Cir.1979). Here we think the record does permit such an inference, and we accordingly sustain the refusal of the ALJ and Board to accept the Hospital's articulated business justifications for its disparate treatment of unit employees vis–a–vis non–unit employees.

We start with the second alleged justification—the Hospital's desire to discourage needlessly drawn out negotiations. We do not pass on the question whether, after unduly prolonged negotiations during which the employer bargained in good faith, an

---

**4.** In June 1977, the Board of Trustees had approved a budget providing a wage increase for all employees effective for the fiscal year beginning October 1, 1977.

**5.** The Union did strike for one day on February 6, 1978.

employer's refusal to extend retroactively to unit employees a wage increase granted similarly situated [6] non–unit employees may be justified by the length of or conduct during bargaining sessions. Here, however, the Board could conclude that it was the Hospital's unlawful piecemeal bargaining strategy, not the Union's conduct, which produced the protracted negotiations. The Hospital cannot invoke its deterrent rule to punish the Union for the Hospital's misconduct.

The Hospital's first justification similarly fails. The Union's refusal to agree to extend the existing contract for any significant length of time occurred while the Hospital's bad faith bargaining strategy was ongoing. The Hospital's alleged dilemma of having no contract to utilize was, in view of its bad faith refusal to make a wages and benefit counterproposal, much of its own making, and blame cannot be shifted to the Union. So, at least, the Board could determine—our function being not to reassess matters de novo but to decide whether the Board's view is supported by substantial evidence.

The Hospital's articulated reasons for denying unit employees benefits granted non–unit employees being unavailing, and no legitimate reason appearing, we uphold the Board's conclusion that the Hospital's conduct was discriminatorily motivated.[7]

The Hospital's petition for review is dismissed and the Board's order is enforced.

*So ordered.*

6. The Hospital has not claimed, for example, that unit employees were less skilled than non unit employees or that supply and demand factors would justify the lower wage, in absolute terms, paid unit employees. We use the term "similarly situated" to designate, in view of the Hospital's policy of standardized employee benefits, the lack of any significant difference between the two groups of employees other than union representation.

7. The Hospital argues the Board's order requiring it to "make whole the [unit] employees . . . for any monetary losses they may have suffered as a result of the Hospital's discriminatory withholding of the wage increases granted to its non–unit employees" is, in view. of *H. K. Porter Co., Inc. v. NLRB*, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970), in excess of its authority. The *H. K. Porter Co.* case dealt with the Board's authority to remedy section 8(a)(5) violations. The make whole order here is to remedy a section 8(a)(3) violation. It is a standard type remedy in discrimination cases and does not exceed the Board's authority.