**EASTERN MAINE MEDICAL CENTER, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 80–1758.

United States Court of Appeals,
First Circuit.

Argued May 7, 1981.

Decided Aug. 31, 1981.

Thomas C. Johnston, Bangor, Me., with whom Clare Hudson Payne, and Eaton, Peabody, Bradford & Veague, Bangor, Me., were on brief, for petitioner.

Marjorie S. Gofreed, Atty., Washington, D. C., with whom William A. Lubbers, General Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Asso-

ciate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., were on brief, for respondent.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, WYZANSKI,* Senior District Judge.

COFFIN, Chief Judge.

The Eastern Maine Medical Center petitions for review of a decision and order of the National Labor Relations Board finding that it committed several unfair labor practices and ordering it to bargain with the Maine State Nurses Association and to make whole certain of its employees. The Board cross-petitions for enforcement. We enforce the Board's order.

Eastern Maine Medical Center (EMMC) is the second largest hospital in the state of Maine with approximately 400 beds and 1400 employees. On March 18, 1976 the registered nurses at EMMC[1] elected the Maine State Nurses Association (MSNA) as their collective bargaining representative by a margin of 114–100, the first EMMC employees to elect union representation. Over the next fifteen months the MSNA failed to obtain an initial collective bargaining agreement, while non-bargaining unit EMMC employees received substantial increases in wages and benefits. On May 31, 1977, shortly after the expiration of the one year election-bar period, a decertification petition was filed and on July 28, 1977 the MSNA was voted out by a margin of 132–81.

The union filed objections to the election on August 3, 1977 and unfair labor practice charges on September 1, 1977. The Regional Director, in his initial report on the election objections, recommended that one of the objections, having to do with the employer's no-solicitation rule, be upheld and that the election be set aside. Thereafter, the Regional Director withdrew his initial report, concluding that several other union objections required an evidentiary hearing. On October 28, 1977, the Regional Director issued a complaint and consolidated the unfair labor practice case with the issues remaining in the representation case. The unfair labor practice complaint alleged that EMMC had violated § 8(a)(1) of the Act by soliciting employees to file a decertification petition and by maintaining and enforcing overly broad no-access and no-solicitation rules; § 8(a)(1) and (3) of the Act by withholding wage increases from bargaining unit employees while granting them to non-bargaining unit employees; and § 8(a)(5) of the Act by refusing to bargain in good faith with the MSNA. At the hearing the General Counsel was permitted to amend the complaint to add an allegation of unlawful interrogation in violation of § 8(a)(1).

After nine days of hearing an Administrative Law Judge (ALJ) found that EMMC had not solicited the decertification petition, but found against EMMC in all other respects. The Board, in an opinion focused principally on the no-solicitation rule, adopted the findings and conclusions of the ALJ, but modified the ALJ's proposed remedy by deleting some of its more stringent provisions.[2]

## I. NO–SOLICITATION AND NO–ACCESS RULES

In the spring of 1975, when the MSNA began its organizing drive at EMMC, the hospital by rule prohibited any solicitation on its property without the advance authorization of the executive director. This rule

* Of the District of Massachusetts, sitting by designation.

1. The bargaining unit was defined as:
"All full-time and regular part-time general duty nurses (staff RN's) employed by the Employer at its Bangor, Maine Medical Center locations, including nurse anesthetists and all instructors and Assistant instructors at the School of Nursing but excluding employee education instructors, supervisors, as-sistant supervisors, head nurses I and II, guards, and all other supervisors as defined in the Act, and all other employees."

2. These were the requirements that EMMC publish notice of its violations in a newspaper of general circulation, bargain for 15 hours per week, submit periodic reports of its bargaining progress and reimburse the union for its bargaining expenses.

was modified and relaxed on October 1, 1975. Two official versions of the new rule were circulated. One version, appearing in a memorandum addressed to all medical center personnel and in EMMC's "Weekly Bulletin", permitted employee solicitation during "break time" in "break areas". The second version, appearing in a memorandum addressed to all other employees, substituted for "break areas", "non-work areas". Solicitation during working time or by non-employees was flatly prohibited.

■ The general principle applied by the Board in solicitation cases, approved in *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1954), is that a rule against employee solicitation during the work time is presumptively valid, while a rule restricting employee solicitation during nonworking time is presumptively invalid. Nonworking time restrictions may be upheld only when the employer demonstrates "special circumstances" making the rule necessary to maintain production or discipline. The Board has modified this general approach with regard to hospitals, to accommodate the special need of patients for a tranquil environment. The Board's rule as to hospitals, first announced in *St. John's Hospital & School of Nursing*, 222 N.L.R.B. 1150 (1976), *enf. granted in part and denied in part*, 557 F.2d 1368 (10th Cir. 1977), allows employer restriction of nonworking time solicitation in "immediate" patient-care areas but maintains the presumption against nonworking time restrictions in other areas, such as cafeterias and lounges, even though they may be accessible to patients. We upheld this presumption as applied to a hospital cafeteria and coffee shop in *NLRB v. Beth Israel Hospital*, 554 F.2d 477 (1st Cir. 1977), *aff'd*, 437 U.S. 483, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978). The Supreme Court in *Beth Israel* and in *NLRB v. Baptist Hospital, Inc.*, 442 U.S. 773, 787–88, 99 S.Ct. 2598, 2606–07, 61 L.Ed.2d 251 (1979) rejected attacks on the validity of the hospital presumption, while registering serious doubt in *Baptist Hospital* that the scope of protectible patient-care areas could rationally be thought to exclude areas commonly used by patients, such as corridors and sitting rooms on patient floors. *Id.* at 788–90, 99 S.Ct. at 2607–08.

■ Under these principles, the EMMC no-solicitation rule was overbroad, and therefore presumptively invalid, in two respects. First, by permitting solicitation only during breaks, and not during other nonworking time, such as before and after work and during lunchtime, the rule did not permit solicitation during the full range of nonworking time. Second, because the rule required that all solicitation take place in nonworking areas or, even more restrictively, in break areas, the rule barred nonworking time solicitation even in areas not involved with the care of patients. Thus, the rule covered substantially more than patient-care areas, even giving that term a broad definition. EMMC failed to introduce any evidence justifying the broad no-solicitation rule as necessary to prevent either disruption of patient care or disturbance of patients. Accordingly, we uphold the Board's conclusion that the no-solicitation rule was overly broad and violative of § 8(a)(1).

While practically conceding the facial invalidity of its rule, EMMC takes issue with the Board's determination that it unlawfully enforced a prohibition on solicitation in the second floor lobby of the hospital. On March 10, 1977 two off-duty registered nurses were soliciting signatures for MSNA membership and dues check-off cards in the public cafeteria on the second floor. When later that day they moved out in the lobby adjoining the cafeteria, the hospital's director of personnel asked them to leave the premises, invoking what he termed the hospital's no-solicitation "policy". The nurses complied.

The hospital contends that the second floor lobby was properly declared off limits to protect friends of patients and "members of the patients' families anxiously awaiting results of surgery" from the potentially disturbing sight of union solicitation. According to the hospital the interest of tranquility of friends and relatives, as well as pa-

tients, is to be balanced against the self-organizational rights of employees. As authority for this proposition, EMMC relies on a statement in Justice Blackmun's concurring opinion in *Beth Israel* that "the patient *and his family* . . . need a restful, uncluttered, relaxing and helpful atmosphere. . . ." 437 U.S. at 509, 98 S.Ct. at 2477 (emphasis added), *quoted in NLRB v. Baptist Hospital, Inc.,* 442 U.S. at 783–84, n.12, 99 S.Ct. at 2604–05. EMMC complains that the Board erred by completely ignoring the interests of relatives and friends of patients.

■ We do not agree with this characterization of the Board's decision. Since the lobby was not a patient-care area and the nurses expelled for soliciting there were off-duty, the hospital bore the burden of proof on the validity of the expulsion. EMMC could have justified its action by showing that solicitation was likely either to disturb patients *or* disrupt health care services. *NLRB v. Baptist Hospital, Inc.,* 442 U.S. at 781, n. 11. The Board observed, we believe correctly, that if visitors were accorded the same protection as patients, virtually every publicly accessible part of the hospital would be off-limits for solicitation, including cafeteria and lobby areas such as those held open to solicitation in *Beth Israel* and *Baptist Hospital.* The Board did not rely on this observation alone, however, but went on to examine in detail the character of the second floor lobby "focussing particularly upon the delivery of health care services at EMMC as that may involve the lobby area at issue. . . .", the second criterion recognized in *Baptist Hospital.*

The Board concluded, based on the following facts, that EMMC had not demonstrated an adverse effect on health care operations. The lobby is a large waiting area open to the general public, immediately adjoining the hospital's public cafeteria. It is used by people on breaks from conferences in nearby conference rooms, those passing to and from the medical library and by nurses who wait there at shift changes to punch the time clock located off the lobby. Lobby users sit, talk, smoke and sometimes eat. Significantly, though not mentioned in EMMC's brief there is a separate waiting room for the use of persons awaiting the results of surgery. These persons use the lobby only when the special surgery waiting room is filled to capacity, and even on those occasions physicians confer about serious problems with waiting family and friends in the relative privacy of the surgery waiting room. There was testimony that some persons waiting for outpatient services used the second floor lobby "rather than wait downstairs" but this was the only reference to patient use of the area. EMMC does not contend that outpatient use of the lobby is frequent or regular or that, on the day in question, there was an overflow from the surgery waiting room.

On this record, there is substantial evidence supporting the Board's decision that EMMC failed to justify its ban on solicitation in the second floor lobby "as necessary to avoid disruption of health-care operations or disturbance of patients", *NLRB v. Beth Israel Hospital,* 437 U.S. at 507, 98 S.Ct. 2477; *NLRB v. Baptist Hospital, Inc.,* 442 U.S. at 781, 99 S.Ct. at 2603. We do not decide, nor do we interpret the Board to hold, that it is unlawful for a hospital to create a special enclave to protect the privacy of conferences between patients' families and physicians from potentially intrusive conduct of all sorts. Nothing approaching such privacy interests was implicated here. The fact that even under overflow conditions, physicians may conduct their conferences with family members in the surgery waiting room, removes any significant possibility of disruption of health-care operations by union solicitation in the lobby. Accordingly, we affirm the Board's holding that EMMC unlawfully enforced its rule.

■ We also enforce that part of the Board's order, not challenged by EMMC, holding that the hospital violated § 8(a)(1) by promulgating an overly broad "no access" rule one week after the lobby incident. The rule forbade off-duty employees to be anywhere on the hospital premises more than one half hour before or after

work, without making allowance for off-duty solicitation in non-working areas. *See Tri-County Medical Center, Inc.,* 222 N.L.R.B. 1089 (1976).

## II. INTERROGATION

The ALJ and the Board determined that the hospital violated § 8(a)(1) through its agent by asking two job applicants about their union sentiments. The uncontradicted testimony was that sometime in May 1977, Louise Moreshead, head of the nursing department, interviewed Gerald and Wilma Laird, then students at the EMMC school of nursing, for positions as graduate nurses. Gerald Laird testified that during the course of the interview, Moreshead asked "what we felt about the union, our opinions and what we knew about it." When Gerald replied noncommittally, Moreshead responded that although she sympathized with the nurses' concerns, she did not agree "with the way they were going about it." At the time, nurses were picketing at the hospital. The Lairds were hired first as graduate nurses and later as registered nurses.

■■ At an early stage of the hearing, the ALJ permitted the General Counsel to amend the complaint to include this incident based on newly discovered evidence. Because the incident was not alleged in the original complaint or charge, and occurred more than six months before the complaint was amended the hospital argues that the amendment was time-barred by § 10(b) of the Act. Section 10(b), 29 U.S.C. § 160(b), provides in part that: "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board. . . ." This provision does not prevent the Board from adding to its complaint related matters not alleged in the charge which it uncovers during the course of investigation; a charge is not a pleading, but merely sets in motion the machinery of an inquiry by the Board. *NLRB v. Kobritz,* 193 F.2d 8, 15 (1st Cir. 1951). Moreover, § 10(b) also provides that "[a]ny such complaint may be amended by the member, agent, or agency conducting the hearing of the Board in its discretion at any time prior to the issuance of an order based thereon." *See NLRB v. Dennison,* 419 F.2d 1080, 1083 (1st Cir. 1969), *cert. denied,* 397 U.S. 1023, 90 S.Ct. 1264, 25 L.Ed.2d 533 (1970). Although the test is sometimes described as one of "close" relationship, this grant of discretion has been interpreted liberally to allow the relation back of amendments alleging acts that are part of the same general course of conduct as the acts alleged in the charge and within the same time frame.[3]

■ The nexus between the amendment and the original charge was not so attenuated as to make the allowance of the amendment an abuse of discretion. Besides the catch-all language on the charge form, the original and amended charges alleged a variety of § 8(a)(3) and (1) unfair practices as well as an effort to "undermine" the MSNA through surface bargaining. The interrogation incident occurred in the midst of these charged unfair labor practices and, reasonably viewed, was of a piece with them. Considering the range of charges,

---

3. *See Rock Hill Telephone Co. v. NLRB,* 605 F.2d 139, 142 (4th Cir. 1979) (all allegations "concern the Company's response to the Union's organizing effort"); *NLRB v. Jack LaLanne Mgmt. Corp.,* 539 F.2d 292, 295 (2d Cir. 1976) (allegations "concerned with similar unfair labor practices designed to further the Company's common objective of punishing workers for favoring union representation, represent 'closely related' parallel conduct toward other employees"); *NLRB v. Braswell Motor Freight Lines, Inc.,* 486 F.2d 743, 745 (7th Cir. 1973) (practices within same general time period, part of overall plan to resist organization, and of the same class and character as those in the original charge); *NLRB v. Central Power &* *Light Co.,* 425 F.2d 1318, 1321 (5th Cir. 1970) ("events complained of were all part of the same alleged anti-union campaign, were close together in time, and were clearly covered by the general language of the formal charge"). Other decisions have eliminated, as a practical matter, any restraint on the scope of amendments by reviewing amendments as a specification of the standard language appearing on the charge form that "[b]y the above and other acts, the above-named employer has interfered with . . . ." protected rights. *See e. g., NLRB v. Transport, Inc. of So. Dakota,* 453 F.2d 193, 196 (8th Cir. 1971); *North American Rockwell Corp. v. NLRB,* 389 F.2d 866, 870 (10th Cir. 1968).

the hospital was on notice that its entire course of conduct regarding the union during the § 10(b) period would be investigated by the Board. EMMC does not, and fairly could not, claim surprise or prejudice.

 Nor do we agree with the hospital on the merits that "the entire factual context" of the exchange requires us to depart from our usual deference to the Board's determination that the questioning had an objectively coercive effect on protected concerted activity. *NLRB v. Otis Hospital*, 545 F.2d 252, 256 (1st Cir. 1976). The context here was an employment interview, not a casual conversation. The interviewee could have been expected to take seriously what was said. Union activity, in the form of picketing, was literally on the scene, as was anti-union activity in the form of a pending or impending decertification petition. Although the Lairds were not applying for immediate positions within the bargaining unit, they would have intended, in the ordinary course, to move up to the rank of registered nurse and could not have been expected to shrug off the comments and inquiries of the head of the nursing department. Other than the at best ambiguous statement that her sympathy for the nurses' concerns did not extend to their tactics, Moreshead said nothing to diminish the apprehension her remarks might have caused, *compare NLRB v. Garland Corp.*, 396 F.2d 707 (1st Cir. 1968) (repeated employer assurances of neutrality), nor does the hospital suggest a legitimate purpose for her queries. These facts provide substantial evidence to support the ALJ's decision that the objective effect of Moreshead's questions and comments in such a charged atmosphere was coercive and therefore violative of § 8(a)(1).

## III. WITHHELD WAGE INCREASE

 The Board concurred in the ALJ's decision that EMMC violated § 8(a)(3) and (1) by withholding from bargaining unit employees a promised wage increase grant-ed to all other employees in April 1977. In a December 1976 memorandum to all employees, the hospital announced that it was "beginning the periodic community survey of wages which is the first step in determining the amount of our next general wage increase". The survey showed that the organized nurses as well as the unorganized employees were due across-the-board wage increases. On March 3, the hospital announced a general wage increase for all employees, averaging 7 per cent, effective April 3, 1977, "except for nurses in the bargaining unit with whom we are currently negotiating." The ALJ determined that the wage increase was discriminatorily withheld with the effect and purpose of undermining the union's status as collective bargaining representative in violation of § 8(a)(3) and (1).

EMMC first argues that by withholding the wage increase it did not change the nurses' conditions of employment but rather maintained the status quo.[4] EMMC contends that the wage increase was not a condition of employment because "there was no policy, pattern, commitment, or practice on the part of EMMC" from which the nurses could expect to receive wage increases following future wage surveys. EMMC suggests that, indeed, if it had included the nurses in the general wage increase, it would have had to answer union charges that it unilaterally changed conditions of employment in violation of § 8(a)(5).

On the record before us, this line of argument is not persuasive. In years past EMMC had regularly increased the wages of its employees to keep up with inflation and community wage patterns as reflected in periodic wage surveys usually conducted annually. The December 1976 survey announcement stated that the hospital was beginning its *"periodic"* wage survey, "the first step in determining the amount of our *next* general wage increase." The year before, in December 1975, the hospital similar-

---

4. Section 8(a)(3) proscribes as an unfair labor practice "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization ...." 29 U.S.C. § 158(a)(3).

ly announced a wage survey followed, in March 1976, by the announcement of a general wage increase, excluding again only the nurses who, on the day before, had voted in the MSNA.[5] EMMC executive director Brandow testified that during his tenure the hospital had conducted such surveys at least annually—ten times in eight and one half years. EMMC has not cited a single example of a wage survey predating the advent of the union that was *not* followed by a general wage increase. We think this evidence more than adequately supports the ALJ's finding that the practice of granting wage increases following periodic surveys was an established condition of employment. *See, e. g., G.A.F. Corp. v. NLRB*, 488 F.2d 306 (2d Cir. 1973); *NLRB v. Dothan Eagle, Inc.*, 434 F.2d 93 (5th Cir. 1970). The December 1976 survey announcement itself conveyed the "clear impression" that the next wage increase was imminent and that only the amount remained to be determined. *NLRB v. Otis Hospital*, 545 F.2d at 256. Indefiniteness as to amount and a flavor of discretion do not, under these circumstances, prevent the undertaking from becoming part of the conditions of employment. *Id.*, at 255; *General*

*Motors Acceptance Corp. v. NLRB*, 476 F.2d 850, 854 (1st Cir. 1973).

Given the longstanding practice in this regard, the assertion that EMMC needed to freeze nurses' wages to *maintain* the status quo and thus to avoid a § 8(a)(5) charge is untenable.[6] *See NLRB v. Katz*, 369 U.S. 736, 746, 82 S.Ct. 1107, 1113, 8 L.Ed.2d 230 (1962); *General Motors Acceptance Corp. v. NLRB*, 476 F.2d at 854. During negotiations the employer's obligation under *Katz* is to maintain the *dynamic* status quo, R. Gorman, *Basic Text on Labor Law* 450–54 (1976), including granting previously announced wage increases. *NLRB v. Allied Products Corp.*, 548 F.2d 644, 652–53 (6th Cir. 1977); *NLRB v. United Aircraft Corp.*, 490 F.2d 1105, 1109 (2d Cir. 1973). Although reasonable minds can differ as to what constitutes an established practice, *see NLRB v. Hendel Mfg. Co., Inc.*, 523 F.2d 133 (2d Cir. 1975), the history here left no room for doubt.[7]

EMMC's second line of defense is that it legitimately withheld the wage increase as an economic weapon to improve its bargaining position, relying on *Chevron Oil Co.*, 182 N.L.R.B. 445 (1970), *enf. granted in part and denied in part*, 442 F.2d 1067 (5th Cir.

---

5. This incident occurred outside the § 10(b) limitations period which commenced March 1, 1977.

6. The hospital posits that whatever action it took would necessarily have been taken unilaterally, hence the risk of unilaterally changing conditions of employment by granting *or* denying the wage increase. EMMC could have avoided this dilemma by bargaining with the union about its plans. Such a dilemma may in fact exist *before* an initial election, where the employer must unilaterally decide the propriety of a pay raise because there is no union to bargain with. *See NLRB v. United Aircraft Corp.*, 490 F.2d 1105, 1111 & n. 6 (2d Cir. 1973). Here, by contrast, EMMC was engaged in bargaining well before the time it decided to deny the increase and yet failed to raise the matter at the bargaining table. Moreover, the MSNA had agreed in a letter to EMMC negotiator Morrell, not to file unfair labor practice charges if the hospital granted the 1976 raise. Morrell refused the request, but noted that he was "pleased to hear that [the] Association would not object if the Medical Center should decide to unilaterally grant raises to the nurses prior to the completion of collective bargaining."

7. EMMC cites *Honolulu Sporting Goods Co.*, 239 N.L.R.B. 1277 (1979) for the proposition that wage increases based upon periodic surveys are not conditions of employment. In that case, the employer instituted a massive wage increase, ranging from 36–48%, shortly after the union filed an election petition. The employer's personnel manual provided that wages should be set according to a periodic area wage survey but, in fact, the employer had not conducted a survey when last setting wages and consequently wages lagged far behind area standards. After the union filed an election petition, the employer quickly conducted a survey and formulated new wage schedules resulting in substantial wage increases. Not surprisingly, the Board determined that the employer's epiphany was a response to the union and not a continuation of past practice. The difference between these circumstances and those in the present case is striking and obvious. *See NLRB v. Styletek*, 520 F.2d 275, 280 n. 4 (1st Cir. 1975) ("This is an entirely different situation from where a sluggish and apathetic employer is suddenly galvanized into action by the appearance on the scene of the union.").

1971). In *Chevron*, the employer used a wage increase granted to nonunion employees as its initial negotiating offer to unionized employees, conditioned upon their acceptance of certain "management rights" provisions. Since bargaining reached an impasse, the unionized employees never received the increase. The Board found this pattern of conduct to be a violation because it occurred in a broader context of bad-faith negotiation. 182 N.L.R.B. at 449. The Fifth Circuit disagreed, finding that the requisite bad-faith context had not been proven. It concluded:

> "[I]n a context of good faith bargaining, and absent other proof of unlawful motive, an employer is privileged to withhold from organized employees wage increases granted to unorganized employees or to condition their grant upon final contract settlement." 442 F.2d at 1074, *quoting* 182 N.L.R.B. at 449.

*Chevron* is inapposite here because it did not concern a wage increase that was a condition of employment. *See NLRB v. United Aircraft Corp.*, 490 F.2d at 1110 n. 4. As we have noted above, the wage increase withheld by EMMC was a condition of employment. An employer cannot be "privilege[d]" to change an existing condition of employment without first bargaining with the union; such a unilateral change is itself a violation of § 8(a)(5). *NLRB v. Katz*, 369 U.S. at 736, 82 S.Ct. at 1107; *see Borden, Inc.*, 196 N.L.R.B. 1170, 1175–76 (1972). Otherwise, as Judge Feinberg observed in *United Aircraft Corp.*:

> "an employer would appear to be entitled, in the hope of improving his bargaining position, to alter all conditions of employment after the union certification, reducing wages to the legal minimum and allowing the work environment to deteriorate. The devastating impact that such action would have upon employee exercise of section 7 rights is indisputable." 490 F.2d at 1110.

Moreover, as formulated in *Chevron*, the privilege asserted by EMMC is subject to two important qualifications—lack of unlawful motivation and lack of bad-faith bargaining. The ALJ supportably found both elements present in this case.

EMMC does not dispute that but for the presence of the union it would have granted the nurses both the 1976 and 1977 pay raises, yet at no time through the end of negotiations was it willing to offer those sums to the union. Not only did the hospital fail to offer the pay raises retroactively, a practice we held to violate § 8(a)(3) when coupled with bad faith bargaining in *South Shore Hospital v. NLRB*, 630 F.2d 40, 45–46 (1st Cir. 1976), but it failed to offer, on any terms, more than a fraction of the wages lost by the nurses as a result of their decision to organize.[8] Thus, while suspending any increase until the close of negotiations, and thereby causing wages for some registered nurses to fall behind those of graduate nurses, EMMC also proposed to deny the greater part of the increase permanently to bargaining unit employees. Magnifying this effect, beginning after the election and continuing through bargaining, EMMC announced and implemented a cornucopia of fringe benefits for non-unit employees. And, in January and March 1978, after the nurses had voted to decertify the union, the hospital unilaterally increased nurses' wages approximately 18 per cent.

The ALJ justifiably concluded that this conduct belied a desire merely to bring pressure on the union to make concessions and evinced an intent to exact a lasting penalty upon the nurses for their decision to unionize: "In short, Respondent's conduct precluded the employees from ever recouping, through bargaining by the Union, the losses which Respondent had imposed on them for selecting it." Taken together, the disparity between the withheld increases and the hospital's wage offer; the hospital's failure to consult the union over freezing nurses' wages, while publicly attributing

---

**8.** At the time of the April 1977 increase was announced, EMMC had "on the table" a wage offer of 5%. This offer approximated the wage increase granted to other employees but denied the nurses in April 1976. After the announcement of the 1977 increase, EMMC improved its wage offer an additional 1%.

the freeze to negotiations; the announcement a year earlier of an identical discriminatory freeze on the day after the union was elected, and the grant, a year later after decertification, of a substantial wage increase; the frequent announcement of improved benefits for non-unit employees, and the evidence of bad faith bargaining discussed *infra*, permitted the inference that EMMC manipulated wage and benefit increases with the purpose and effect of inducing the nurses to withdraw their support for the union. *See Soule Glass and Glazing Co. v. NLRB*, 652 F.2d 1055, at 1077–1078 (1st Cir. 1981); *South Shore Hospital v. NLRB*, 630 F.2d at 45–46; *General Motors Acceptance Corp. v. NLRB*, 476 F.2d at 854–55; *KDEN Broadcasting Co.*, 225 N.L.R.B. 25 (1967); *McCormick Longmeadow Stone Co.*, 157 N.L.R.B. 1237 (1966). Although the hospital's continuation of "merit increases", conceded to be conditions of employment, is some evidence of good faith, it is not sufficient basis to overturn the ALJ's determination.[9]

## IV. OVERALL FAILURE TO BARGAIN IN GOOD FAITH

█ More than in most areas of labor law, distinguishing hard bargaining from surface bargaining calls for sifting a complex array of facts, which taken in isolation may often be ambiguous. *See NLRB v. General Electric Co.*, 418 F.2d 736, 756 (2d Cir. 1969), *cert. denied*, 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970) ("compounded like a mosaic of many pieces, but depending not on any one alone"). "In every case, the basic question is whether the employer acted like a man with a mind closed against agreement with the union. The Board can judge his subjective state of mind only by asking whether a normal employer, willing to agree with a labor union, would have followed the same course of action." Cox, *The Duty to Bargain in Good Faith*, 71 Harv.L.Rev. 1401, 1419 (1958). The duty to bargain "does not compel either

party to agree to a proposal or require the making of a concession", 29 U.S.C. § 158(d). At the same time, "if the Board is not to be blinded by empty talk and by the mere surface motions of collective bargaining, it must take some cognizance of the reasonableness of the positions taken by an employer in the course of bargaining negotiations." *NLRB v. Reed & Prince Mfg. Co.*, 205 F.2d 131, 134 (1st Cir.), *cert. denied*, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953).

There is indeed a tension created by asking the Board to judge the reasonableness of the bargainers, but not to supervise the substance of their bargaining. The major resource making this tension tolerable is the agency's accumulated institutional experience in making precisely those sorts of judgments. We thus do not lightly disregard the Board's informed judgment in the especially delicate task of judging whether, in context, a strategy of bargaining is more likely calculated to obstruct agreement than to bring about the best compromise possible. *South Shore Hospital v. NLRB*, 630 F.2d at 43, *quoting NLRB v. Katz*, 369 U.S. 736, 747, 82 S.Ct. 1107, 1113, 8 L.Ed.2d 230 (1962); *NLRB v. Reed & Prince Mfg. Co.*, 205 F.2d at 134, *quoting Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951).

█ The same deference cannot be given a Board of Inquiry appointed by the Federal Mediation and Conciliation Service, whose judgment EMMC asks that we prefer here. The primary function of a Board of Inquiry is to achieve *prompt* conciliation, *see* 29 U.S.C. § 183; its recommendations are ancillary to that function. The fact that a Board of Inquiry report predominantly recommends adoption of one party's proposals, as the report in this case favored many of EMMC's proposals, may indicate that their preferred proponent is indeed more reasonable than the other party, or, just the opposite that he is so unreasonable that only by capitulation to his demands is a

---

9. We do not pass on the ALJ's alternative holding that the wage withholding was so destructive of important employee rights as to constitute a § 8(a)(3) violation without regard to

employer motivation. *See NLRB v. Great Dane Trailers*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967); *NLRB v. United Aircraft Corp.*, 490 F.2d at 1110.

speedy resolution possible. We do not take either view in this case, nor do we suggest that the Board of Inquiry's report has no evidentiary value. We do adhere to our function of reviewing the Labor Board's decision for its fidelity to the record and to national labor policy.

The bargaining history of the parties, covering 22 meetings over eight months, has been traversed in minute detail in the opinion of the ALJ and in the briefs of the parties. We have carefully reviewed the evidence and find that it substantially supports the conclusion of the Board and the ALJ that the hospital sought to avoid reaching agreement with the MSNA in the hope of ridding itself of the union. Without attempting to reconstruct that history, we note the principal salient findings.

From the outset, EMMC was unreceptive to legitimate MSNA requests regarding the mechanics of meeting times and places and disclosure of bargaining information. During the earlier negotiations, EMMC openly refused to discuss economic issues; it was not until the MSNA had enlisted the aid of a federal mediator that EMMC presented an economic proposal of any kind, five months after receiving MSNA's first economic proposal and three months after bargaining began. Even after a Board of Inquiry was convened, EMMC professed its unwillingness to engage in "serious" economic negotiations without agreement to the substance of its non-economic demands. EMMC's wage offer—5 per cent initially, followed by a second and final offer of 6 per cent over 1975 wage scales (without retroactivity)—represented a substantial loss in the nurses' wage position relative to other EMMC employees.

The EMMC economic package, which was at all times tendered only "as a package", was expressly conditioned on "agreement" to and, at the final meeting, "acceptance" of the EMMC non-economic proposal. The latter included an encyclopedic management rights clause paired with a finality clause requiring the union to waive its rights to bargain during the term of the agreement over all matters covered or not covered in the agreement. EMMC demanded the inclusion of these two clauses without change from the first day of bargaining to the last. Despite MSNA's adoption of many concessions suggested in the report of the Board of Inquiry, EMMC rejected the report's recommendation that it compensate the nurses for their loss of "equity position" due to the wage freeze, claiming, without plausible justification, that no such loss had occurred. Both before and during bargaining, EMMC frequently announced increases in wages and benefits for non-unit employees. These memoranda noted the exclusion of bargaining unit nurses and customarily closed by thanking the employees for their "continued commitment to EMMC".

Apart from superficial indications of uncooperativeness, a particular vice identified by the Board in this case was the hospital's refusal to negotiate in good faith over economic issues, accomplished first by outright refusal and then by conditioning agreement on economic issues on MSNA acceptance of EMMC's unyielding stance on non-economic issues. Furthermore, any agreement on economics was contingent on assent to the EMMC economic proposal "as a package". This policy of no "serious" economic bargaining without acquiescence on non-economic issues was stated in the EMMC submission to the Board of Inquiry. Substantial evidence supports the ALJ's finding that serious economic bargaining never got underway because important non-economic issues never were resolved. The position that such conditional bargaining is permissible has been rejected by the Board and the courts. See, e. g., South Shore Hospital v. NLRB, 630 F.2d at 43–44; Federal Mogul Corp., 212 N.L.R.B. 950 (1974), enf'd, 524 F.2d 37 (6th Cir. 1975); NLRB v. Patent Trader, Inc., 415 F.2d 190, 198 (2d Cir. 1969), modified on other grounds, 426 F.2d 791 (1970) (en banc); Adrian Daily Telegram, 214 N.L.R.B. 1103 (1974). We defer here, as in South Shore, to the Board's judgment that this approach impaired bar-

gaining flexibility and thus impeded compromise.[10]

The ALJ was also warranted in finding that, in these circumstances, the tendency of conditional bargaining to foreclose meaningful negotiation was exacerbated by EMMC's insistence that its economic proposal be accepted "as a package". As explained by EMMC's chief negotiator, this meant that: "You could not accept one portion of the economic proposal and say its okay and say it is tentatively agreed. It is not on the table on that basis. In order to get tentative agreement under [the] economic proposal, the proposal had to be accepted as a package." Though this tactic, standing alone, may be unobjectionable, the ALJ supportably concluded that: "In composite, these positions taken by Respondent, narrowed the bargainable issues to such an extent that bargaining on economic matters was virtually non-existent."

The ALJ found other evidence of inflexibility in the hospital's intransigence regarding its management rights clause. The clause, as written, would have given the hospital unilateral control over every aspect of the employment relationship, exclusive of wages and benefits. Even as to these there was doubt, since the hospital reserved the right to "change . . . jobs [and] positions" along with the right "to establish wage rates for new or changed jobs or positions". The major problem with the clause was not its particularity, as EMMC suggests, but its expansive reach, which, because of EMMC's interlocking bargaining conditions and universal finality clause, would have required the union to cede substantially all of its representation function as a pre-condition to meaningful discussion of economic issues. Arbitration, limited in EMMC's proposal to the express terms of the contract, could not have provided an effective substitute for the rights thus waived. *See Stuart Radiator Core Mfg. Co., Inc.*, 173 N.L.R.B. 125 (1968).

EMMC misconstrues the ALJ's opinion by arguing that an employer may lawfully insist upon a management rights clause. That much is settled. *NLRB v. American National Insurance Co.*, 343 U.S. 395, 409, 72 S.Ct. 824, 832, 96 L.Ed. 1027 (1952). But, as EMMC itself notes: "An inference of bad faith might be drawn where an employer insisted upon reserving certain management rights, while refusing to negotiate a full agenda of negotiable items." EMMC further argues that the management rights clause was far more narrow, and therefore less important, than first appears because it was made subordinate to other provisions of the agreement. This argument cuts against EMMC more than for it. To the extent that the language in the EMMC management rights clause was superseded by other provisions and thereby rendered meaningless, it is difficult to understand how, in good faith, EMMC could have insisted on the verbatim retention of *all* of its language in any final agreement. In fact, the subordinating clause was quite narrowly confined to management rights "*expressly* modified or restricted by a *specific* provision" of the agreement, so that in the event of the slightest doubt of coverage, the management rights clause would prevail over other inconsistent provisions. During bargaining, both parties treated the wording of the management rights clause as extremely important, even as to subjects covered elsewhere. The ALJ was not required to find otherwise.

The ALJ also found evidence of disposition against agreement in EMMC's practices regarding wage and benefit increases, discussed *supra*. This inference too was permissible. *South Shore Hospital v. NLRB*, 630 F.2d at 44–45; *General Motors Acceptance Corp. v. NLRB*, 476 F.2d at 854–56. The offer presented to the nurses was to give up the right to bargain or to

---

**10.** EMMC maintains that MSNA representatives agreed at the first meeting to discuss non-economic issues first. We find no basis on the record to overturn the ALJ's credibility-based determination that no such agreement existed. In any event, it was clear by the second meeting that the purported agreement was no longer agreeable to the MSNA negotiators and yet EMMC persisted in its refusal to discuss economics. *See South Shore Hospital v. NLRB*, 630 F.2d at 44.

strike over changes in conditions of employment, in exchange for a wage increase equal to half of what they would have expected to receive without bargaining—hardly the kind of offer calculated to win acceptance or even advance discussion with a "self-respecting union". *NLRB v. Reed & Prince Mfg. Co.*, 205 F.2d at 139. The ALJ concluded reasonably that the narrow arbitration clause proposed by the hospital did not significantly offset this disparity.

We recognize and share the concern of EMMC that neither the Board nor we may fashion the content of collective bargaining. We must also recognize that each party has an enforceable right to good faith bargaining on the part of the other and that, "[s]ometimes, especially if the parties are sophisticated, the only indicia of bad faith may be the proposals advanced and adhered to". *NLRB v. Wright Motors, Inc.*, 603 F.2d 604, 609 (7th Cir. 1979).

We have considered EMMC's other objections, particularly those relating to the ALJ's credibility determinations, and find them unavailing. We conclude that there is substantial evidence supporting the Board's determination that the EMMC failed overall to bargain in good faith in violation of § 8(a)(5).[11]

## V. REMEDY

■ EMMC objects that there is insufficient factual basis to support the imposition of the "extraordinary" remedy of a bargaining order. *See NLRB v. Gissel Packing Co., Inc.*, 395 U.S. 595, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); *NLRB v. Pilgrim Foods, Inc.*, 591 F.2d 110, 118–120 (1st Cir. 1978). A bargaining order is properly described as "extraordinary" when it bypasses the testing of employee choice in an election and orders recognition of a union based upon a card majority. A bargaining order in that case goes beyond restoring the

status quo ante and potentially undermines employee freedom of choice. Here, a majority of the nurses elected the MSNA in the first instance and, the Board concluded, EMMC's unfair labor practices undermined the employees' exercise of free choice in that election. Under these circumstances, nothing less than a bargaining order would restore the status quo ante and protect the integrity of the original election. *See Frank Bros. Co. v. NLRB*, 321 U.S. 702, 705, 64 S.Ct. 817, 819, 88 L.Ed. 1020 (1947); *NLRB v. All Brand Printing Corp.*, 594 F.2d 926, 929 (2d Cir. 1979). Accordingly, we do not accept EMMC's characterization of the remedy as "extraordinary" in this case, nor do we think the remedy is unjustified in view of the serious and pervasive violations disclosed in the record. *See NLRB v. Matouk Industries, Inc.*, 582 F.2d 125, 130 (1st Cir. 1978).

■ Coming four years after violations on the order of those found here, we also believe the Board was well within its remedial discretion in ordering notice by mail to all EMMC employees. *See Statler Industries, Inc. v. NLRB*, 644 F.2d 902, 909–10 (1st Cir. 1981). We caution the Board to exercise care in calculating back pay to include only those amounts that would have been granted but for the hospital's unlawful conduct. *NLRB v. Otis Hospital*, 545 F.2d at 257.

*Enforcement granted; petition for review denied.*

---

11. We also uphold the determination that EMMC's failure to notify or consult with the MSNA before instituting wage increases for the nurses in January and March of 1978, during the pendency of these proceedings and while objections to the decertification election were pending, independently violated § 8(a)(5).

Even had EMMC bargained to impasse in good faith, this increase far exceeded its last offer to the union. *See NLRB v. Katz*, 369 U.S. at 745, 82 S.Ct. at 1112; *NLRB v. Pacific Grinding Wheel Co., Inc.*, 572 F.2d 1343, 1349 (9th Cir. 1978).