**CORRECTED OPINION**

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

FIELDCREST CANNON, INCORPORATED,
Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD,

No. 95-2658

Respondent,

UNION OF NEEDLETRADES, INDUSTRIAL
AND TEXTILE EMPLOYEES, AFL-CIO,
CLC,
Intervenor.

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

v.                                                    No. 95-2829

FIELDCREST CANNON, INCORPORATED,
Respondent.

On Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board.
(11-CA-14494, 11-CA-14584, 11-CA-14643, 11-CA-14723,
11-CA-14730, 11-CA-14735, 11-CA-14771, 11-CA-14815,
11-CA-15006, 11-RC-5776)

Argued: May 8, 1996

Decided: September 26, 1996

Before WILKINSON, Chief Judge, and LUTTIG and MICHAEL,
Circuit Judges.

Enforcement granted in part and denied in part by published opinion. Chief Judge Wilkinson announced the judgment of the court and wrote the majority opinion in parts I through IV, in which Judge Michael joined. Judge Luttig joined in the judgment denying enforcement of the salary differential aspect of the Board's order. Chief Judge Wilkinson wrote a concurring opinion. Judge Luttig wrote an opinion dissenting in part. Judge Michael wrote an opinion concurring in part and dissenting in part.

_____

## COUNSEL

**ARGUED:** Charles Preyer Roberts, III, HAYNSWORTH, BALDWIN, JOHNSON & GREAVES, Greensboro, North Carolina, for Fieldcrest. John Harlan Fawley, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for NLRB. David Malcolm Prouty, UNION OF NEEDLETRADES, INDUSTRIAL AND TEXTILE EMPLOYEES, AFL-CIO, CLC, New York, New York, for Intervenor. **ON BRIEF:** Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Howard E. Perlstein, Deputy Assistant General Counsel, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for NLRB. Jonathan R. Harkavy, PATTERSON, HARKAVY & LAWRENCE, Greensboro, North Carolina, for Intervenor.

_____

## OPINION

WILKINSON, Chief Judge:

The National Labor Relations Board found that Fieldcrest Cannon, Inc. had committed more than 100 violations of the National Labor Relations Act during a union organization campaign at its facilities in Cabarrus and Rowan Counties, North Carolina. Fieldcrest offers three responses to these findings: (1) that the ALJ's credibility determinations were biased in favor of the union; (2) that the Board's findings on the various violations were not supported by substantial evidence; and (3) that a portion of the Board's remedy, which required Field-

2

crest to offer union employees the same pay raise given to non-union employees, exceeded the Board's power. We agree with the Board that substantial evidence supports the great majority of violations found here and we reject the company's claims that the agency proceedings were impermissibly biased. We agree with Fieldcrest, however, that the discharges of Ronald Pharr, Earl White, and Cathy Thompson did not run afoul of the Act. We also agree with Fieldcrest that the Board was without authority to alter the salary increase agreed to by Fieldcrest and the union during collective bargaining. For these reasons, we enforce the Board's order in part and deny enforcement in part.

I.

Fieldcrest manufactures linens at both union and non-union plants throughout the southeastern United States. In 1986, Fieldcrest purchased Cannon Mills, a major competitor with 11,000 non-union employees located in Cabarrus and Rowan Counties, North Carolina. On June 12, 1991, the Amalgamated Clothing and Textiles Workers Union sought to organize 6000 employees at these facilities.

The election campaign was hotly contested, and Fieldcrest took an aggressive approach to convincing employees to vote against the union. Fieldcrest's campaign literature was graphic. One flier showed a mushroom cloud and the words: "There's more than one way to destroy a community. VOTE NO." Another showed a closed mill with the words: "The plant was unionized by ACTWU. The plant was closed for economic reasons in 1985." Yet another showed workers standing outside a gate near a sign that said "closed." Its caption read: "In the past decade, scores of textile plants have closed in North Carolina. Thousands of workers have lost their jobs . . . Vote NO union."

Over the course of the campaign and in its aftermath, union supporters suffered numerous incidents of hostility. There were unlawful interrogations, such as when supervisors Reganna Earwood and Ruth Blalock brought Reginald Turner into an office and questioned his support for the union. They suggested that he change his mind by signing a card, which would withdraw his support from the union. When Turner hesitated, he was told that he already had "two points

3

against him" and that failure to sign the card would put him "right out the door."

There were also threats of reprisal if employees voted for the union, such as supervisor James Allman's statement that Fieldcrest would move to Mexico if the union prevailed, supervisor Windy Black's assertion that the union's activity would postpone a scheduled pay raise, and supervisor Ted Godfrey's warning that Fieldcrest would strictly enforce its rules if the union prevailed. The threats also appeared on fliers. One Spanish language flier warned: "If you sign the [union card] and the Government finds out about it, you will be deported or sent to prison."

Employees who supported the union were harassed. While Fieldcrest supervisors Tammy Fox, Eddie Gurley, and Diane Neely distributed pro-company literature during employees' working time, employees who distributed union literature had their literature seized and were admonished that they could lose their jobs. Supervisors also sought to intimidate union activists by monitoring their work and personal activities though they had not been monitored before the campaign and non-union workers were not so monitored. For example, after the union campaign started, supervisor Perry Harkey tracked union activist Tony Bumgarner "every hour on the hour, watch in his hand." After Terry Smothers' wife wrote a pro-union op-ed piece for the local newspaper, Smothers' movements were restricted to one floor so that his activities could be monitored. Before his wife's column was published, Smothers freely assisted technicians throughout two floors. Conspicuously, when the union campaign ended, Smothers was allowed to return to his usual duties.

Employees were also punished for their union activities. The day after Sherry Anthony announced her support for the union, she was prohibited from taking coffee breaks outside of her section. Another union supporter, Oreida Clarke, lost her responsibilities as a Spanish language translator because company officials were concerned about what she might tell Spanish speaking employees. And union supporter Sylvia Crawford was removed as a tour guide for new employees-- until the union campaign ended.

Ten employees lost their jobs. Elboyd Deal, a 30-year veteran, was disciplined and discharged for speaking out on behalf of the union

4

and for, in the words of supervisor James O'Kelly, acting as the "ring-leader" of the organization campaign. At one point, O'Kelly said bluntly: "You see what your union badge is doing for you, Mr. Deal."

The representation election was held on August 20 and 21, 1991. The final tally showed 3443 votes for the company, 3053 votes for the union, and 307 unresolved challenged ballots. Upon losing the election, the union alleged that the company unlawfully discriminated against 20 employees and committed approximately 109 violations of the Act.

On September 9, Fieldcrest implemented a 5.5% wage increase at its non-union plants. On September 17, Fieldcrest and the union entered into collective bargaining to discuss wages and benefits at the unionized facilities. Fieldcrest initially proposed a 4% wage increase while the union sought a 6% increase. By September 27, Fieldcrest's offer stood at 4.25% and the union's counteroffer at 5.5%. On November 4, all benefit issues had been resolved, but the union continued to claim that its employees were entitled to at least the same wage increase received by non-union employees. When the parties met again on January 12, 1992, Fieldcrest increased its offer to 4.5%, and the union accepted.

The union thereafter brought a complaint under the Act. It claimed that Fieldcrest violated the Act by its conduct during the organization campaign, and also by refusing to grant union workers the same wage increase received by non-union employees. Both claims were consolidated in a single proceeding before an Administrative Law Judge. Trial began on March 31, 1992 and concluded on January 25, 1993. The testimony of 256 witnesses extended over 36 days of hearings.

On March 1, 1994, the ALJ issued his opinion. He uniformly found in favor of the union on issues of credibility and held that Fieldcrest had engaged in more than 100 unfair labor practices. The Board affirmed the ALJ's conclusions. It ordered a new election, required that injured employees be reinstated and made whole, and directed the company to cease and desist from unfair labor practices. The Board also ordered Fieldcrest to grant its union employees the same 5.5% pay raise given to non-union employees and to return to the bargain-

5

ing table over the terms and conditions of employment. Fieldcrest now appeals.

## II.

Fieldcrest lodges various objections to the fact-finding process in this case, which we shall consider in turn.

## A.

Fieldcrest first presents statistical arguments, which it claims prove that the ALJ's method for determining the credibility of witnesses was biased. Fieldcrest notes that the ALJ credited all of the general counsel's witnesses and none of its own; this, it claims, demonstrates bias. Our review shall not be driven, however, by an overall statistical balance of whose witnesses received credit and whose did not. To do so would amount to judging a case by some mechanical formula rather than the merits of the evidence. After all, such statistics do not inform us whether "a credibility determination is unreasonable, contradicts other findings of fact, or is `based on an inadequate reason or no reason at all.'" NLRB v. McCullough Environmental Services, Inc., 5 F.3d 923, 928 (5th Cir. 1993) (citation omitted).

Fieldcrest also argues that the ALJ's prior record in other cases indicates a bias in favor of labor unions. Fieldcrest cites statistical evidence showing that this ALJ has ruled against employers on 105 of 108 section 8(a)(3) allegations and on 550 of 589 total allegations. The Board counters by noting that of the ALJ's prior 79 cases, courts have reviewed only 16, and of these 16, courts have fully enforced 13. We will not rate a judge, however, by the percentage of times he or she rules on a given side of a case. To evaluate an ALJ's impartiality in this way amounts to judging his record by mere result or reputation. In reality, such statistics tell us little or nothing. Fieldcrest's numbers do not tell us whether the ALJ decided individual cases correctly, and the Board's figures do not tell us why, in 63 cases, the losing party chose not to appeal.

We shall set aside the statistics. Instead, we shall examine the fact-finding in this case to assess whether the record as a whole supports

6

the ALJ's determinations. A decision-maker's ruling deserves to rise or fall on the case at hand, not on the results in other cases that have little bearing upon the issues before us.

B.

We thus turn to the instant case. The credibility determinations that Fieldcrest challenges here were the product of lengthy and thorough proceedings during which each party had an ample opportunity to present its respective position to the ALJ. The testimony occupied 36 days of hearings. There were 83 witnesses presented by the NLRB general counsel, 154 by Fieldcrest, and 19 by the union. The testimony of these 256 witnesses filled more than 7800 transcript pages.

The ALJ's decision reflects careful consideration of this voluminous testimony. In the ALJ's lengthy, 93-page, single-spaced opinion, he took pains to spell out each violation, the evidence supporting the violation, and his reasons for ruling as he did. His examination of one episode illustrates the care he took. Drenia Smith, an employee, alleged that her supervisor, Terry Burris, threatened her. The ALJ first reviewed Drenia Smith's testimony that Burris said that the union would mean "friendships would be lost, that people would fire bomb houses, and that there would be strikes and violence," that picket-line crossers would be beaten, and that "the plant would close down." The ALJ then summarized Burris' testimony:

> Burris agreed that he had a conversation with Drenia Smith early in the campaign. He agreed that he told Smith that trouble seemed to follow unions, and that it was possible that he told her he had seen reports of firebombing and violence.

Finally, the ALJ analyzed the two witnesses' testimony. He discussed whether Smith's testimony had been elicited with leading questions, and determined that it had not. After discussing how Burris' testimony corroborated many of Smith's allegations, the ALJ ultimately credited Smith's testimony.

The ALJ's review of other testimony was similarly meticulous. Reviewing courts owe deference to such factual findings, assessing

7

them only to determine whether they are supported by substantial evidence. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951). When factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent "exceptional circumstances." NLRB v. Air Products & Chemicals, Inc., 717 F.2d 141, 145 (4th Cir. 1983). Exceptional circumstances include cases where "a credibility determination is unreasonable, contradicts other findings of fact, or is `based on an inadequate reason or no reason at all.'" McCullough, 5 F.3d at 928 (citation omitted). Only in such a situation is a reviewing court "free to review the record and independently reach [its] own conclusions." McCullough, 5 F.3d at 928. Otherwise, careful fact finding, such as that undertaken in this case, is entitled to respect.

C.

Fieldcrest next contends that the ALJ improperly credited witnesses who testified against Fieldcrest on the basis of their employment status. Fieldcrest notes that on 55 occasions, the ALJ credited 38 witnesses in this manner. In particular, Fieldcrest objects to the ALJ's statement that union employees' testimony was entitled to "considerable weight" in credibility determinations because "it is unlikely that a current employee will testify falsely against his employer." In L.S. Ayres v. NLRB, this court rejected such a conclusion, holding that "the fact that a witness is an employee at the time that he testifies adversely to his employer is at most only a factor bearing on his credibility and one entitled to little weight." 551 F.2d 586, 588 (4th Cir. 1977) (emphasis added). In Standard-Coosa-Thatcher Carpet Yarn Div. v. NLRB, we reiterated that "the mere fact that an employee exposes himself to retaliation by testifying against his employer has little bearing on credibility." 691 F.2d 1133, 1138 (4th Cir. 1982), cert. denied, 460 U.S. 1083 (1983) (emphasis added).

The reason for the Ayres holding is not difficult to discern. It is just as likely that an employee testifying against his employer is also testifying in his own self-interest as a union supporter. As the court pointed out in Ayres, an employee "may be strongly motivated to establish an employer unfair labor practice." 551 F.2d at 588 n.3. Employees could be so motivated because of their involvement with the union. Or they might have been subject to discipline from the

8

company, and the finding of an NLRA violation could potentially insulate them from any sanction.

While we thus agree with Fieldcrest that the ALJ erred in giving more than a "little" weight to a witness' status as an employee, that does not end the Ayres inquiry. As demonstrated in Standard, such an error does not necessitate denial of enforcement if "the record adequately supports the administrative law judge's credibility determination." 691 F.2d at 1138. In Standard, the company's witness never denied mentioning the union in his warning. The court found that the absence of a direct denial sufficiently supported the ALJ's credibility determination, despite the ALJ's reliance on the witness' employment status.

In other cases dealing with questions of credibility, we have also enforced the Board's orders notwithstanding concerns over the possibility that the ALJ gave more than a "little" weight to the witness' status as an employee in determining credibility. See Ayres, 551 F.2d at 588; Air Products, 717 F.2d at 141. In Ayres, this court enforced the Board's order because "substantial evidence supports at least some of the findings of violation of § 8(a)(1)." 551 F.2d at 587. We explained there that "full consideration to the other indicia of credibility should be given." Id. at 588. In Air Products, we found similarly, holding that the ALJ sufficiently relied upon other indicia of credibility including "the absence of direct denials by Employer's witnesses, the demeanor of the witnesses, [ ] the situation surrounding the election campaign," and other corroborating testimony. 717 F.2d at 145-46.

All of the other indicia of credibility described in Air Products were present here. Quite apart from the employment status of those testifying, there was sufficient evidence for the ALJ to credit the great majority of the union's witnesses. First, the ALJ repeatedly noted the absence of direct denials on the part of company witnesses. For instance, Graciela Whitley testified that supervisor James Allman told her not to "sign papers for the union" and said that if the union wins, "we will have to move the company to Mexico." The ALJ noted that Whitley's testimony was particularly clear. Most importantly though, Allman did not refute the charges. Whitley's testimony was thus appropriately credited.

9

On some occasions, the relevant company witness even failed to take the stand. Oreida Clarke alleged that the company posted a notice in Spanish threatening workers with deportation if they signed union cards. Though this allegation was partially credited because of her employment status, the ALJ also noted that the company's witnesses who denied posting such a notice did not "include all supervisors who may have done so." Accordingly, the ALJ concluded that the company's "evidence does not directly rebut Clarke's testimony that she saw the notice."

The testimony of company witnesses also suffered from comparative vagueness. Comparative vagueness was central to the credibility determination involving current employee Brenda Lyles, who testified regarding threats of plant closure made by supervisor Howard Hall. While the ALJ did mention Lyles' employment status, he also compared the witnesses' respective recall. Supervisor Hall could "hardly remember the conversation," but Lyles offered detailed testimony. As a result, the ALJ ultimately concluded that Lyles should be credited because she "had much better recall of this conversation."

Inconsistency was yet another problem for the company's witnesses. For example, supervisor Perry Harkey denied spending additional time on the floor monitoring employees, yet he simultaneously admitted that management had ordered him "to be available for employees' questions." The ALJ noted that because Harkey would have had to spend more time on the floor to be available for employees' questions, Harkey's denial that he was spending more time on the production floor undermined his credibility. Consequently, the ALJ credited current employee Tony Bumgarner's testimony that Harkey had monitored union employees.

Absence of denial, comparative vagueness, and internal inconsistency are factors that may legitimately bear on an ALJ's decision to credit a company or a union witness. Over the course of his opinion, the ALJ noted that the union witnesses' testimony stood unrebutted on 34 occasions. Likewise, the ALJ mentioned the inconsistent or contradictory nature of company testimony at least 20 times.

To a lesser extent, the ALJ also relied on the demeanor of witnesses, another factor bearing on credibility determinations. Air

10

Products, 717 F.2d at 145. The ALJ stated on the first page of his opinion, "On the basis of . . . my observation of the demeanor of the witnesses, I make the following findings of fact." While presumably, every one of the ALJ's credibility determinations hinged on the demeanor of the witnesses, he specifically cited demeanor on two occasions. With regard to Reginald Turner, who testified that his supervisor threatened to fire him if he supported the union, the ALJ cited Turner's "demeanor" and found his testimony "more truthful" than the company's witness. Discussing another witness, who denied that Fieldcrest's offer of discounted merchandise to employees was designed to influence the forthcoming union election, the ALJ explained that the company witness' "demeanor was not that of a trustworthy witness."

Even where demeanor was not specifically mentioned, it appears to have supported the ALJ's credibility determinations. Though Sandra Greene's testimony (regarding Windy Black's threats that employees would not receive a pay raise because of the union) was credited because she was a current employee, the ALJ also noted that "Greene was a more truthful witness than Black." And Sharon Davis, who testified that supervisor Don Hancock had monitored union employees, was regarded as a more "credible witness" than Hancock. As the Seventh Circuit explained, "Credibility . . . is a function not only of what a witness says but of how a witness says it." NLRB v. Overnite Transportation Co., 938 F.2d 815, 819 (7th Cir. 1991). While some of the ALJ's assessments of demeanor are certainly general, the balancing of witnesses' testimony is at the heart of the fact-finding process, and it is normally not the role of reviewing courts to second-guess a fact-finder's determinations about who appeared more "truthful" or "credible."

Moreover, the ALJ was not remiss in observing that the representation campaign as a whole was marked by an atmosphere of intimidation and hostility toward the union. Fieldcrest posted signs showing a locked gate accompanied by the words: "What do Fieldcrest Cannon's Bedspread Mill and Sheeting Mill in Eden have in common? Both plants were unionized by ACTWU. Both plants were closed due to economic conditions." Other fliers detailed the loss of jobs at Fieldcrest's unionized plants, contained pictures of abandoned facilities, and, as noted earlier, depicted a nuclear explosion with the

11

words "There's more than one way to destroy a community. VOTE NO." An atmosphere of reprisal and recrimination against union supporters may provide a context for evaluating the testimony of witnesses and no doubt enhanced the credibility of those who were accusing the company of violations.

Finally, there was also substantial corroborating testimony to support the ALJ's credibility determinations. When current employee Peggy Jordan testified that managers Buck Reese and Harold Roseman threatened the loss of current benefits if the union was voted in, her testimony was also corroborated by other witnesses. The ALJ noted that Jordan's testimony was decidedly similar to "statements made to employees by other supervisors." Given the cumulative weight of different witnesses alleging nearly identical incidents, Jordan's credibility was enhanced. The ALJ relied on similar corroborating evidence no less than 49 times over the course of his opinion.

The above examples constitute no more than a sampling, but they are sufficient to demonstrate how the ALJ approached his task. He erred in relying on the employee status of the witnesses before him, but there is a great deal of other evidence supporting the conclusions that he reached. We are not prepared to set at naught findings that are solidly grounded in the evidence. Standard, 691 F.2d at 1138. The ALJ's opinion provides a detailed discussion of why the union witnesses' testimony was more persuasive than the testimony offered by Fieldcrest's witnesses. As a result, it is proper to conclude that the record here "adequately supports the administrative law judge's credibility determination[s]." Id.

D.

In sum, Fieldcrest's attack on the ALJ's credibility determinations misses the forest for the trees. Its attack upon the ALJ fails ultimately to divert attention from the central point of this litigation: the overwhelming evidence against Fieldcrest. The vast majority of the 100 plus violations here were not only supported by substantial evidence. The whole of this case is greater even than the sum of its respective parts. Fieldcrest's threats and reprisals against union adherents included:

12

unlawful interrogations; a threat of discharge if a union withdrawal card was not signed; threats of lost benefits; threats of disciplinary action; threats of termination; threats of plant closure if employees selected the union; the posting of a threat of deportation to Spanish-speaking employees if they signed union cards; threats of other reprisal; harassment; an order to wear a pro-employer t-shirt; threats of more stringent enforcement of the rules if the union was selected; assignment of additional work; closer monitoring and surveillance of union employees; restriction of union members' movement; prohibiting employees from engaging in conversation about the union; disparate treatment; and various warnings and discharges that appeared to stem in part from the employees' union activities.

See Fieldcrest-Cannon, Inc. and Amalgamated Clothing and Textile Workers Union, 318 N.L.R.B. No. 54 (August 25, 1995).

While it is difficult to convey the full weight of the case against Fieldcrest merely by listing violations and discussing a few examples, the Board concluded that Fieldcrest's unfair labor practices were "numerous," "pervasive," "outrageous," "egregious," and "notorious." The Board member who dissented on minor aspects of the case agreed with the majority that "the number and pervasiveness of the Respondent's unfair labor practices warrant remedies beyond those of the ordinary case." (Board Member Stephens, concurring in part). So too did the ALJ conclude that Fieldcrest "`has engaged in such egregious and widespread misconduct as to demonstrate a general disregard for employees' statutory rights.'" (quoting Hickmott Foods, 242 N.L.R.B. 1357 (1979)). The record reveals that this is not a strong case from the company's standpoint. While it is assuredly lawful for a company to oppose the unionization of its workforce, see 29 U.S.C. § 158(c), Fieldcrest simply adopted a scorched earth, take-no-prisoners approach to stop unionization without regard to statutory limitations. The cumulative evidence in this case amply supports the ALJ's determinations--the kind of ground-floor determinations by a fact-finder to which we would be obliged to defer even under less condemning circumstances.

13

III.

The broad picture does not, of course, relieve this court from the obligation to review Fieldcrest's challenge to individual findings of discrimination in violation of § 8(a) of the Act. 29 U.S.C. § 158(a) ("It shall be an unfair labor practice for an employer (1) to interfere with, restrain, or coerce employees in the exercise of [their] rights . . . (2) to dominate or interfere with the formation . . . of any labor organization . . . (3) [discriminate] in regard to the hire or tenure of employment or any term or condition of employment to discourage membership in any labor organization . . . (4) to discharge or otherwise discriminate against an employee because he has filed charges . . . (5) to refuse to bargain collectively"). While the majority of those findings are supported by substantial evidence, three are not. Ronald Pharr, Earl White, and Cathy Thompson were all discharged for misconduct unrelated to the union campaign. Accordingly, these employees were not entitled to relief under the Act.

A.

Ronald Pharr was discharged for refusing to take a breathalyzer test. One of Pharr's coworkers, Rosie Robinson, complained to supervisor Percy Smith that Pharr was harassing her. Smith then approached Pharr, and according to Smith, Pharr was "really smelling" of alcohol. According to Pharr, Smith said: "Ron, I smell alcohol on your breath and I'm going to give you a breathalyzer." After Pharr wandered around the plant for some time and failed to report to the testing room (presumably to diminish his blood alcohol content), Pharr allowed himself to be escorted off the premises without ever submitting to a blood alcohol test. At the hearing, Pharr admitted that he had consumed beer immediately before work. Pharr also testified about two prior incidents of alcohol abuse at Fieldcrest: (1) he came to work "smelling kind of strong" of alcohol and was warned by Smith; (2) he drank so much Cisco (a fortified wine which "gets you high pretty quick") that he had to be sent home sick because he was too "dizzy" to work. Pharr's criminal record also includes injuring real property and two assaults, one of a government official. Given Pharr's own testimony, his termination had nothing to do with the union campaign and everything to do with his own misconduct.

14

B.

Earl White was discharged for disruptive behavior while working as a probationary employee. White's behavior was reported from several sources and ranged from murderous threats to sexual harassment. Co-worker Ivey Mosely testified that White had threatened to "shoot" another employee. And White's supervisor, Jimmy Allen, received at least three complaints regarding White's violent nature: (1) that White argued with Harold Caldwell and threatened to kill him; (2) that White threatened Kevin Glasco with bodily harm; and (3) that White intended to harm Abraham Mincer. Fieldcrest was also legitimately concerned about White's behavior around women. Co-worker Patsy Jamerson testified that White would "grab" women and "touch them" and "say sexual--sometimes sexual remarks to them." Roslyn Hemphill testified that she endured such harassment and had complained on two occasions to Allen. The cumulative weight of this testimony suggests that White's termination was not related to his union activity.

C.

Cathy Thompson was discharged for running her towel machine without towels in it, thereby increasing her production and pay. Thompson admitted on the witness stand that she had cheated on production before, and her company records reflected two prior warnings for this behavior. Just before Thompson's termination, three of her co-workers (Walter Waller, Sam Jallah, and Kelly Walker) reported Thompson to supervisor Reganna Earwood, each alleging that Thompson was cheating on production. According to Walker, Thompson managed more than 500 false runs every night. As a result of these complaints, Earwood eventually caught Thompson cheating on the machine. Given this evidence, we do not think that Thompson's termination had anything to do with the union campaign.

As the discharge of these three employees did not amount to a violation of section 8(a)(3) of the Act, we decline to enforce that portion of the Board's order that required Pharr, White, and Thompson to be reinstated and made whole.

15

IV.

We next turn to the question of remedy. The Board's order provided an extensive list of remedies in addition to the reinstatement and compensation of those employees who had been discriminatorily discharged or disciplined. The Board ordered that Fieldcrest: (1) hold a new election off-premises; (2) cease and desist from the unfair labor practices; (3) rescind unlawful company rules; (4) supply the union with names and addresses of its non-union employees; (5) allow the union reasonable access to its bulletin boards; (6) grant the union access to nonwork areas during employees' nonwork time; (7) allow the union to respond to company speeches regarding the issue of representation; (8) afford the union the right to deliver a 30-minute speech to employees on working time prior to the election; (9) post notices at its plants of the Board's findings; (10) publish the notices in various company newsletters and local newspapers; (11) mail the notices to employees; and (12) require a company representative to read the notice to its employees. We agree with the Board that, under the extraordinary circumstances of this case, these steps did not amount to an abuse of the Board's remedial power. See Monfort, Inc. v. NLRB, 965 F.2d 1538 (10th Cir. 1992). We do not suggest that these steps would be appropriate in every case.

V.

We enforce the Board's order with the exception of those aspects relating to Ronald Pharr, Earl White, and Cathy Thompson and those portions addressing the pay raise differential between Fieldcrest's union and non-union employees. As to those matters, we deny enforcement.

ENFORCEMENT GRANTED IN PART AND DENIED IN PART

WILKINSON, Chief Judge, concurring:

I write simply to express my reasons for voting to deny enforcement of that aspect of the Board's order altering the salary increase agreed to by Fieldcrest and the union in the course of collective bargaining. A brief word of background is in order at the outset.

16

After Fieldcrest had raised non-union employees' salaries by 5.5%, it entered into collective bargaining negotiations with the union over the appropriate rate at which union employees' pay should be increased. Fieldcrest initially sought the figure of 4% and the union, 6%. As the negotiations progressed, Fieldcrest increased its figure to 4.25% and the union decreased its request to 5.5%, before they eventually agreed to 4.5%. In the end, therefore, the non-union employees received a 5.5% salary increase and the union employees, a 4.5% increase.

The Board, in its order addressing the 1% difference between the two pay increases, required that Fieldcrest make whole its union-represented employees by extending to them the 5.5% salary increase granted to non-union employees. It also ordered Fieldcrest to resume bargaining with the union over the "terms and conditions of employment." As both of these remedies constitute improper attempts by the Board to influence the outcome of collective bargaining, they exceed the Board's power as outlined by the Act and by Supreme Court precedent. See H.K. Porter Co. v. NLRB, 397 U.S. 99, 103 (1970); NLRB v. American National Insurance Co., 343 U.S. 395, 404 (1952). Accordingly, that portion of the Board's bargaining order relating to the salary differential between union and non-union employees cannot be enforced.

A.

Section 8(d) of the Act states that the obligation to bargain "does not compel either party to agree to a proposal or require the making of a concession." 29 U.S.C. § 158(d). Pursuant to this section, the Supreme Court has consistently held that the Board shall not be allowed to influence the results of collective bargaining. This is because the "object of the Act was not to allow governmental regulation of the terms and conditions of employment, but rather to ensure that employers and their employees could work together to establish mutually satisfactory conditions." H.K. Porter, 397 U.S. 99 at 103. Accordingly, the Board cannot "directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements." American National, 343 U.S. at 404.

The Board's order that Fieldcrest extend the salary increase given to non-union employees to its union employees was improper. The

17

Supreme Court rejected precisely such an order in H.K. Porter, which was "the first time in the 35-year history of the Act that the Board [ ] ordered either an employer or a union to agree to a substantive term of a collective-bargaining agreement." 397 U.S. at 106. In that case, the Board found that the employer's failure to agree to a union demand for union dues checkoff was not in good faith, and it ordered the company to grant the union's request. The Supreme Court, however, held that the Board lacked the remedial authority under the Act to require the employer to accept any particular term: "while the Board does have power under the National Labor Relations Act to require employers and employees to negotiate, it is without power to compel a company or a union to agree to any substantive contractual provision of a collective-bargaining agreement." Id. at 102. In short, "the results of the contest" should be left to "the bargaining strengths of the parties." Id. at 108.

This circuit has followed H.K. Porter when facing circumstances similar to those presented here. In Clearwater Finishing Co. v. NLRB, 670 F.2d 464, 466 (4th Cir. 1982), the company refused to agree to the union's bargaining demand for a retroactive pay increase which had already been granted to non-union employees. The Board found that the company lacked good faith and required it to grant the retroactive pay increase to union employees. This court disagreed, explaining that "the Board's order that the Company grant the proposed wage increase retroactively is beyond the scope of its authority as set out in H.K. Porter." Id. at 468.

The Board in this case similarly exceeded its authority. Here, as in Clearwater, the Board altered the terms of a pay raise, a substantive element of a collective bargaining agreement. Fieldcrest and the union had negotiated over a period of four months, and each had proposed at least three different figures for the pay increase. In fact, the Board's order here is even more intrusive than the ones rejected in Clearwater and H.K. Porter. In this case, the parties actually had agreed to a pay raise of 4.5%. The Board thus did more than side with one party's position in ongoing negotiations; it dictated a change to the pay raise already agreed upon by both parties. This, the Act clearly does not allow. H.K. Porter, 397 U.S. at 102.

That portion of the Board's order that would require Fieldcrest and the union to renegotiate the agreed-upon salary increase of 4.5% must

18

likewise be rejected. As the Supreme Court explained in American National, "Congress provided expressly that the Board should not pass upon the desirability of the substantive terms of labor agreements." 343 U.S. at 408-9. This would certainly be the result if the Board could order the parties to renegotiate a term already agreed to by the parties during collective bargaining. Moreover, such an order is tantamount to dictating the terms of the agreement. The Act, of course, does not allow such a result. Id.; see also H.K. Porter, 397 U.S. at 102.

B.

The Board, however, contends that its imposition of collective bargaining terms was justified because Fieldcrest's offer of a 4.5% salary increase to the union lacked good faith. Section 8(d) of the Act requires that parties "confer in good faith with respect to wages, hours, and other terms and conditions of employment," 29 U.S.C. 158(d), and negotiate "with the view of reaching an agreement if possible." NLRB v. Highland Park Mfg. Co., 110 F.2d 632, 637 (4th Cir. 1940); see also NLRB v. Katz, 369 U.S. 736, 747 (1962) (the parties shall not possess "a cast of mind against reaching agreement"). While Fieldcrest maintains that the existence of an actual agreement is itself proof that it entered into negotiations with the good faith intention of reaching agreement, the Board and the union offer various reasons for why this is not so. I shall address each of those arguments in turn.

1.

The Board contends that Fieldcrest's record of unfair labor practices demonstrates that Fieldcrest did not intend to bargain in good faith with the union. While the Board is correct that courts have looked outside of the negotiations for activity indicative of "a cast of mind against reaching agreement," Katz, 369 U.S. at 747; see Radisson Plaza Minneapolis v. NLRB, 987 F.2d at 1376, 1381 (8th Cir. 1993), these cases involved attempts to ascertain whether the bargaining constituted a "'charade or sham [intended] to avoid reaching an agreement.'" Radisson, 987 F.2d at 1381 (quoting Continental Insurance Co. v. NLRB, 495 F.2d 44, 48 (2nd Cir. 1974) (emphasis added). Such inquiries, however, are pointless when the parties have already reached agreement. Here, the agreement itself proves the

19

good faith of the parties: if the parties had no intention of reaching an agreement, no agreement would have been reached.

2.

The union maintains that the existence of an agreement cannot itself prove good faith because parties may reach an agreement in the absence of good faith. The union suggests that it conceded to Fieldcrest's term merely so that it could litigate Fieldcrest's bargaining position--and of course, so that it could give its workers an immediate wage increase of 4.5%. Essentially, the union claims that Fieldcrest lacked good faith because it had no future intention of continuing to bargain had the union rejected the 4.5% term. But we have no way of knowing what Fieldcrest would have done had the union either refused that offer or gone on strike. Violations of the Act cannot be based on speculation. While it is true that further delay in reaching a pay increase (or the initiation of a strike) might have undermined support for the union at Fieldcrest, a party may not use the courts to circumvent the collective bargaining process. After all, tough give-and-take is part of collective bargaining, and it was ultimately the union's choice to accept the offer on the table or continue to negotiate.

3.

The union also contends that Fieldcrest's failure to offer the 5.5% raise to union employees during the negotiations (or perhaps, even to use this figure as the starting point for the negotiations) demonstrates an absence of good faith. The Board itself has noted, however, that "regarding the grant of new benefits to unrepresented workers, the most that can be said is that the Act may impose on the employer the duty to bargain with respect to providing the new benefits to represented employees." B.F. Goodrich Co., 195 N.L.R.B. 914, 915 (1972); see also H.K. Porter, 397 U.S. at 102; Winn-Dixie Raleigh, Inc., 267 N.L.R.B. 231, 236 (1983).

The flaw in the union's argument here is apparent when one considers the hypothetical opposite case, where Fieldcrest attempts to impose on the union the same pay increase granted to non-union employees. Had Fieldcrest, for example, given non-union employees

20

a 3.5% pay increase, certainly Fieldcrest could not have unilaterally imposed that increase on the union; the union would have wanted the opportunity to bargain for the 4.5% raise. In fact, this was precisely what the union tried to accomplish here. The union initially sought not the 5.5% given to non-union employees, but rather, a higher salary increase, 6%.

While the union assumes that its employees will always be at least as well off as non-union employees, collective bargaining entails the risk that they will be worse off. Presumably, when employees vote for union representation, they are making a prediction that more often than not, they will be better off. But certainly, there is no guarantee that this will be true in every case. As the Supreme Court explained in H.K. Porter:

> the Act as presently drawn does not contemplate that unions will always be able to secure and achieve agreement even when their economic position is weak, or that strikes or lockouts will never result from a collective bargaining impasse. It cannot be said that the Act forbids an employer or a union to rely ultimately on its economic strength.

397 U.S. at 109.

The union's failure to obtain its desired increase of 6% was ultimately the consequence of its lack of economic strength. In recent years, the percentage of unionized employees at Fieldcrest had decreased from 65% of its employees to less than 25%. Moreover, the union had agreed to salary increases of 4%-4.5% from Fieldcrest's competitors. Most importantly, though, the union publicly disavowed the viability of a strike and even promised Fieldcrest's employees that it would not strike. Given these circumstances, the threat of a strike was no longer credible, and the realities of the bargaining process determined the ultimate result.

4.

The Board also contends that the good faith inquiry must include the underlying motivation for reaching an agreement. For instance, if

21

Fieldcrest's motive for pursuing the 4.5% term included the desire to undermine the union, the Board would presumably find an absence of good faith. Again, while evidence of such motives might be useful to prove the existence of a "`charade or sham [intended] to <u>avoid</u> reaching an agreement,'" <u>Radisson</u>, 987 F.2d at 1381 (quoting <u>Continental Insurance Co.</u>, 495 F.2d at 48 (emphasis added), the parties reached agreement here.

Moreover, the Board's assumption that certain motivations somehow invalidate collective bargaining agreements is a questionable one. Consider Fieldcrest's potential motives for the salary differential: discouraging unionization at its other plants; taking advantage of the union's unusually weak bargaining position; recompensating its coffers for previous pay increases to union employees; saving funds in anticipation of future pay increases; or giving union employees a lower pay increase than non-union employees because union members receive other costly benefits (benefits that non-union employees may not receive). All of these are merely aspects of the same overarching motive that <u>always</u> controls the company's position: the maximization of profit. As the Seventh Circuit explained, the company that does "whatever it can to maximize its profits by minimizing its labor costs invites a test of strength with its unions. It does not commit an unfair labor practice." <u>Graphic Communications Union v. NLRB</u>, 977 F.2d 1168, 1171 (7th Cir. 1992).

The union's varied motivations for seeking a 6% pay increase appear equally irrelevant to the validity of the bargaining. Perhaps the union sought to one-up the non-union pay raise to further its campaign at Fieldcrest's other facilities and thus to enlarge its membership. Is it an absence of good faith for a union to want more than what the company considers a "fair" pay increase? Of course not. Whatever the union's underlying motive(s) may have been for seeking 6%, the union was merely attempting to improve the condition of its membership.

It is precisely this fundamental conflict between the rational interests of the company and those of the union that necessitates collective bargaining in the first place. And ultimately, so long as the parties are actually bargaining (and no charade exists), one need not be concerned about various motives affecting the negotiations--the ultimate

22

agreement will always reflect the parties' legitimate bargaining strength. As reliance on one's bargaining strength was precisely what Congress intended when it passed the Act, this cannot substantiate the absence of good faith. H.K. Porter, 397 U.S. at 108.

In sum, the Board should have respected the outcome of the collective bargaining process.

LUTTIG, Circuit Judge, dissenting in part:

One cannot possibly read the record and the administrative law judge's decision at issue in this case without being left with the impression that, whether through a series of innocent legal errors or, as Fieldcrest Cannon contends, through manifest pro-Union bias, the ALJ never gave Fieldcrest a chance to have its defense to the Union's claims fairly considered. Indeed, the opinion upon which the Company's substantial liability is now predicated appears as nothing more than a series of rationalizations for a predetermined finding of liability against the Company. For example, after conducting some 36 days of hearings, which consume more than 7800 pages of transcript, the ALJ ended up crediting the testimony of nearly every single one of the 100 witnesses who appeared on behalf of the Union and discrediting the testimony of nearly every single one of the 150 witnesses presented by the Company, finding approximately 130 violations of the National Labor Relations Act from among the 130-plus violations alleged by the Union. As the majority notes, the comparative numbers of witnesses credited by a factfinder cannot, in itself, serve as a measure of the correctness of a decision. At the same time, however, we cannot be naive to the real possibility in this instance that, contrary to the majority's uncritical assumption, the ALJ's wholesale crediting of the Union's witnesses and corresponding discrediting of the Company's witnesses was more than simply the happenstance result of a dispassionate consideration of the substantive testimony of the 250 witnesses in question. Regardless of whether it was merely a composite of innocent errors or outright bias against the Company that resulted in the decision we review herein, the ALJ's conclusions, and consequently the judgment of the Board, are wholly insupportable in law. Accordingly, although I join in the judgment rejecting the Board's order of a retroactive salary increase for the Company's

23

union employees, I dissent from the majority's affirmance of the Board's liability determinations.

The ALJ's errors are various and sundry, but three broad categories of errors combine to confirm the palpable unfairness of the proceeding below. First, in direct contravention of this court's precedent, the ALJ uniformly credited those employee-witnesses who testified on the Union's behalf, merely because they were employees of Fieldcrest Cannon; second, the ALJ found violations of the National Labor Relations Act in many incidents that are not, as a matter of law, even colorable violations of the Act; and third, the ALJ based many of his findings of violation on no evidence whatsoever, merely inferring certain violations of the Act from what he erroneously found to be management animus toward the Union.

The first and foremost error of the ALJ was that, in direct contravention of this court's precedent, he weighted heavily the testimony of Fieldcrest employees who testified against the Company, merely because they were employed by the Company. In L.S. Ayres & Co. v. National Labor Relations Bd., 551 F.2d 586 (4th Cir. 1977), we held that, "the fact that a witness is an employee at the time that he testifies adversely to his employer is at most only a factor bearing upon his credibility and one entitled to little weight unless it is established that he does not know that he is protected in testifying." Id. at 588 (emphases added). In direct disregard of Ayres, the ALJ expressly and repeatedly held that the testimony of current employees was entitled to "considerable weight" because, he reasoned, it was "unlikely that a current employee will testify falsely against his employer." J.A. at 61 & n.12. Representative are the following: that, "[t]he testimony of [Angela] Coleman, a current employee, [was] entitled to considerable weight," J.A. at 61; that Eric Strickland's "status as a company employee at the time of his testimony ma[de] it unlikely that he testified against his Employer's interest," J.A. at 61-62; that Sandra Greene "was a current employee at the time of her testimony, and for that reason, it is unlikely that her testimony was false," J.A. at 62; that Benny McIntyre's "testimony, as a current employee, [was] entitled to considerable weight," J.A. at 64; that "it[was] unlikely that the[ ] testimony [of employees Terros Brown and Johnny High] against the interests of their employer was false," J.A. at 66; that Drenia Smith's status as a current employee "enhance[d] her credibility," J.A. at 67;

24

that, "[a]s a current employee, it [was] unlikely that [Brenda Lyles] testified falsely against her Employer's interest," J.A. at 68; and that Oreida Clarke's "trustworthiness [was] augmented by her status as a current employee," J.A. at 69. In fact, the ALJ expressly credited employee witnesses due solely or partially to their employment status some 50 times (and, likely, implicitly in many others), clearly a sufficiently large number of instances such that it is impossible to affirm the ALJ's conclusions as the majority does. See J.A. at 61 (Angela Coleman), 61 (Eric Strickland), 62 (Sandra Greene), 64 (Benny McIntyre), 66 (Johnny High & Terros Brown), 67 (Drenia Smith), 68 (Brenda Lyles), 69 (Oreida Clarke), 76 (Sandra Greene), 77 (Tony Bumgarner), 77 (Sharon Davis), 78 (Joanne Diggs & Sylvia Crawford), 78 (Drenia Smith, Pat Boger, & Sheila Deal), 78 (Vicki Fink), 79 (Angela Coleman), 83 (Terry Smothers), 83 (Sherry Anthony), 84 (Sylvia Crawford), 87 (Sharon Davis), 88 (Benny McIntyre), 88 (Peggy Jordan), 89 (Euretha Lee, Sherry Anthony, & Paula Brice), 89 (Sharon Davis), 90 (Wade Story), 92 (Sharon Davis), 93 (Eric Strickland), 94 (Vickie Fink), 94 (Kemberly Watts), 95 (Brenda Harrell & Cynthia Hanes), 95 (Patricia Boone), 102 (Jenny Vires & Daniel Vires), 103 (Oscar Clark), 103 (Patsy Turner & Barbara Cook), 103 (Patsy Turner), 104 (George Cochran), 104 (Wilbert Williams & John Rossner), 105 (Cynthia Hanes), 105 (Sharon Davis), 105 (Drenia Smith), 105 (Clafter Jackson), 115 (Diana Hamilton), 143 (Norma Chapman).

The majority acknowledges that the ALJ erred by crediting witnesses based solely on their status as employees, but concludes that there are "other indicia of credibility" which render the error harmless. There are no such "other indicia of credibility" evident in the record before us. Tellingly, even the majority is able to identify, from the scores of incidents at issue, only a meager seven or eight examples which supposedly confirm that there were alternative reasons for presuming the truthfulness of the pro-Union witnesses' testimony and presumptively discrediting the Company witnesses' testimony. And, in fact, not one of even these noticeably few examples supports the majority's conclusion.

The majority cites two examples of the "absence of direct denials by company witnesses" in support of its claim that there were other indicia of reliability for the ALJ's impermissible crediting of pro-

25

Union witnesses. Neither example supports its conclusion. In the first of these, the incident between James Allman and Graciela Whitley, ante at 9, although the ALJ did note that supervisor "Allman did not testify," the ALJ did not even rely on that fact in crediting Whitley, nor did he mention that fact in his "factual and legal discussion." J.A. at 66. In any event, this was not an incident in which the ALJ explicitly credited a witness based on his employee status. In the second incident, Oreida Clarke alleged that the Company posted a Spanish notice threatening workers who signed union cards, ante at 10, but, as the ALJ himself noted, "all of the Company's witnesses denied posting any Spanish notice, much less one of the nature described by Clarke." J.A. at 69. Of course, contrary to the majority's conclusion, the fact that not all of the Company's supervisors testified does not render Clarke's testimony unrebutted. Compare ante at 10 ("[T]he company's witnesses who denied posting such a notice did not `include all supervisors who may have done so.'" (quoting J.A. at 69) (emphasis added)).

The majority cites but a single example of the "comparative vagueness" of the Union's witnesses vis-a-vis the Company's witnesses, ante at 10, and, likewise, this example does not support the majority's assertion that there were alternative reasons for crediting the witnesses improperly credited by the ALJ. Whether or not supervisor Howard Hall "could hardly remember" the details of the conversation between himself and Brenda Lyles, ante at 10, Hall, as even the ALJ conceded, "denied saying anything about plant closure and added that supervisors had been warned against making any such statements." J.A. at 68.

Similarly, it is impossible to discern in the majority's lone example of "internal inconsistency" of Company witness testimony any inconsistency at all, much less one that would justify the crediting of Union witness testimony over Company witness testimony. In that example, supervisor Perry Harkey simply denied that he spent additional time on the floor in order to fulfill his added responsibilities to "be available" to answer employee questions during the election. There is nothing even arguably inconsistent in this testimony; indeed, the ALJ's finding (without explanation) that Harkey's testimony was inconsistent because he could not have fulfilled his added responsibil-

26

ity to "be available" for questions without increasing his time on the floor, J.A. at 77, is nothing short of silly.

The "substantial corroborating testimony" which the majority would have one believe supports the ALJ's credibility determinations, ante at 12, is not corroborating testimony at all. For example, when a supervisor and an employee agreed that a conversation took place or that an incident occurred, but disagreed as to what was said or what occurred, the ALJ, consistent with the manner in which he conducted the balance of the hearing, found that the agreement partially corroborated the employee's testimony. See, e.g., J.A. at 64, 103.

"To a lesser extent," the majority relies upon witness demeanor evidence assertedly relied upon by the ALJ in making credibility determinations, and it cites four examples of the ALJ's supposed reliance on such demeanor evidence. Ante at 10-11. Even the majority must concede, however, that, in two of these instances, the ALJ himself did not even cite demeanor as a reason for his crediting of the Union's witnesses. Of course, even when the ALJ did rely upon demeanor, it cannot possibly be known whether the ALJ would have credited the pro-Union witnesses' testimony on the strength of demeanor alone, had the ALJ not impermissibly accorded those witnesses' testimony considerable weight at the outset.

Finally, the majority holds that the "atmosphere of reprisal and recrimination against union supporters" justified the ALJ's presumption of truthfulness with regard to Union employees, ante at 12. Obviously, even if such an atmosphere existed, this alone would be no ground for crediting, as a matter of law, one party's witnesses over another's. To uphold the ALJ's findings on this ground is to relieve the Union altogether of its burden to prove violations of the Act.

In sum, contrary to the majority's assertion, there is simply no basis in the record for sustaining the ALJ's findings, in the face of his conceded error in presuming the truthfulness of all pro-Union employee witnesses and the contrary of all Company witnesses.

Wholly apart from the ALJ's erroneous crediting of the Union's employee witnesses over the Company's witnesses, the ALJ found egregious violations of the NLRA where, as a matter of law, there

27

were not even colorable violations. Illustrative is the first "violation" described by the ALJ. There, supervisor Diane Hartis handed out pro-company t-shirts to employees who asked for them. J.A. at 58. Employee Sylvia Crawford asked Hartis for a shirt, and Hartis said "[f]ine" and gave her one. Id. When Hartis learned that Crawford intended to deface the shirt, she told Crawford,"[i]f you search in your heart, will you please just give the shirt back." Id. Hartis also said, "I don't want to be made a fool of." Id. Crawford admitted that some of the employees were defacing the shirts and told Hartis that she would give the shirt back to Hartis if she changed the slogan. Hartis replied, "Please give it back," and Crawford later returned the shirt. Id. On the basis of these exchanges alone, the ALJ concluded that Hartis "coercively interrogated Crawford about her union sentiments." Id. Of course, Hartis' request that Crawford return the shirt rather than deface it was not even arguably coercion or interrogation in violation of section 8(a)(1).

The ALJ even found that the Company violated the Act when it remedied or promised to remedy employee grievances, J.A. at 95-98, and when it held grievance meetings for employees. The utter ridiculousness of the ALJ's findings is perhaps best summed up in the following passage, in which the ALJ described M.D. Ford's "violation" of the NLRA:

> Ford's own testimony establishes that his meetings with employees after the advent of the union campaign increased markedly over the number of asserted meetings prior to that time. There is no question, as Ford admitted, that he asked employees about their concerns and problems.

J.A. at 96 (emphasis added). And, unfortunately, similar examples of the ALJ's errors abound throughout the record.

Finally, as if to add insult to injury, the ALJ inferred countless violations from the Company's "extraordinary animus" and "widespread violations," both of which he found to exist only because he improperly credited all of the Union's witnesses and otherwise misread section 8(a). Most notably, the ALJ relied on these unwarranted presumptions to establish prima facie cases that protected conduct was a motivating factor in the Company's discipline or discharge of

28

pro-union employees. J.A. at 110, 112, 114, 116, 117, 119. In fact, the ALJ sometimes relied <u>exclusively</u> on anti-union animus to establish such prima facie cases. J.A. at 110, 112.

Thus, at bottom, the ALJ's errors in this case are so egregious and pervasive that it cannot possibly be said that the record offers substantial evidence for his findings. In holding to the contrary, the majority has, for purposes of this case at least, redefined our role in the review of such ALJ findings into an empty act of <u>pro forma</u> ratification.

I respectfully dissent.

MICHAEL, Circuit Judge, concurring in part and dissenting in part:

I readily concur in parts I through IV of the majority opinion. I respectfully dissent, however, from the majority's holding (in part V) that the Board exceeded its authority in ordering Fieldcrest to grant its union workers the same wage increase the company unilaterally and discriminatorily granted its workers in unrepresented plants. I dissent to that extent because I believe substantial evidence in the record as a whole supports the Board's finding that Fieldcrest violated § 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3), and because the Board has "the primary responsibility and broad discretion to devise remedies that effectuate the policies of the Act, subject only to limited judicial review." <u>Sure-Tan, Inc. v. NLRB</u>, 467 U.S. 883, 898-99 (1984) (interpreting NLRA § 10, 29 U.S.C. § 160). Moreover, the majority's holding on the pay remedy is inconsistent with our own precedent and creates an inadvisable split of authority between us and our sister circuits.

I.

Since 1978 Fieldcrest's practice with respect to wage increases had been to negotiate a wage increase for its union-represented plants first and afterward to give the same increase to its non-union plants.[1] The
_____
[1] There were only a few immaterial departures from this practice. In 1987 and 1988 Fieldcrest employees at certain newly-acquired plants received a smaller wage increase in order to standardize their pay with

Board found that as part of a campaign to discourage union member-
ship at other plants, Fieldcrest (in 1991) departed from its usual and
customary practice of handling wage increases. Specifically, before
entering into wage negotiations with the union, it unilaterally granted
a 5.5 percent wage increase to workers who were not represented by
the union. Fieldcrest granted this increase even though the company
had lost money in the first part of the year. In wage negotiations
Fieldcrest refused to offer the same wage increase to represented
workers, offering only a 4.5 percent increase.[2]

The Board found that numerous Fieldcrest supervisors told
employees at the unrepresented plants that they received their larger
wage increase as a reward for defeating the union. Supervisors at
union plants told employees that they were denied a pay increase
because they were at a union plant. One supervisor said that the com-
pany insisted on the smaller wage increase "to discredit the Union and
try to drive it out of the mill." The Board found:

> [Fieldcrest's] discriminatory departure from its practice of
> granting identical wage benefits to its represented and
> unrepresented employees indicates [Fieldcrest's] desire to
> frustrate bargaining and to "undermine and destroy" the
> Union. [Fieldcrest's] extreme [anti-]union animus is further
> evidenced by the numerous unfair labor practice violations

_____

the pay scale of employees at the plants the company already owned. In
1986 the company delayed implementation of a pay increase at union
plants due to a dispute over how third-shift pay should be handled. In
1981 a wage increase in union plants was delayed due to a dispute over
payment of insurance premiums. The Board's finding that these scattered
incidents were not material alterations in Fieldcrest's wage increase pol-
icy is supported by substantial evidence in the record as a whole. See
NLRA § 10(e), 29 U.S.C. § 160(e).

[2] The concurring opinion characterizes the wage increase disparity as
a "1% difference." Conc. Op., ante at 17. Although the disparity is a one
percentage point difference when total wages are compared, the magni-
tude of the disparity is much greater when the amounts of the increases
are compared to each other. Non-union employees got a raise that was
22 percent higher than union employees.

discussed in the [administrative law] judge's decision. Such a pattern of discriminatory conduct is inconsistent with good-faith bargaining, and reflects [Fieldcrest's] determination not to reach agreement with the Union.

In addition, [Fieldcrest's] agents made statements both during and outside the negotiations which strongly suggested that its wage-increase proposals to the Union were intended both to punish the Union for its attempts to organize the unorganized plants and to undermine any further attempts at organization. These statements came from the highest levels of [Fieldcrest's] management as well as several supervisors on the shop floor.

Fieldcrest Cannon, Inc., 318 NLRB No. 54, at 2-3 (1995). The Board concluded that the company's conduct violated NLRA§§ 8(a)(1), (3) & (5).

II.

The Board's choice of remedy must be enforced unless it is arbitrary, capricious, or manifestly contrary to the statute. ABF Freight Sys., Inc. v. NLRB, 114 S. Ct. 835, 839 (1994) (on remedial issues "the Board's views merit the greatest deference"); accord Sure-Tan, 467 U.S. at 898-99 (1984); Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194 (1941); Monfort, Inc. v. NLRB, 965 F.2d 1538, 1548 & n.15 (10th Cir. 1992); Conair Corp. v. NLRB, 721 F.2d 1355, 1385-87 (D.C. Cir. 1983), cert. denied, 467 U.S. 1241 (1984). Given Fieldcrest's "scorched earth, take-no-prisoners approach to stop unionization without regard to statutory limitations," Maj. Op., ante at 13,[3] the Board's chosen remedy was appropriate.

_____

[3] Indeed, Fieldcrest mounted "a Stalingrad defense of sorts to the threat of unionization, fighting the Union, by any means at hand, from rock to rock and from tree to tree." NLRB v. Horizon Air Servs., 761 F.2d 22, 29 n.5 (1st Cir. 1985).

A.

I recognize that a simple violation of the duty to bargain in good faith cannot justify the pay remedy the Board ordered. H. K. Porter Co. v. NLRB, 397 U.S. 99, 108 (1970). If an employer refuses to bargain in good faith in violation of § 8(a)(5), the Board may order the employer to bargain in good faith but may not compel the employer to accept any particular union demand. The rule is intended to allow employees and employers to make their own contract. The Board exceeds its authority when it attempts to write the parties' contract for them. NLRB v. Insurance Agents Int'l Union, AFL-CIO, 361 U.S. 477, 488 (1960); NLRB v. American Nat'l Ins. Co. , 343 U.S. 395, 404 (1952). "[W]hile the Board does have power . . . to require employers and employees to negotiate, it is without power to compel a company or a union to agree to any substantive contractual provision of a collective-bargaining agreement." H.K. Porter , 397 U.S. at 102. "[T]he duty to bargain collectively does not carry with it the duty to reach an agreement." Id. at 104 (quoting S. Rep. No. 573, 74th Cong., 1st Sess., 12 (1935)). This rule is embodied NLRA§ 8(d), which provides that

> to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession.

I also recognize that in Clearwater Finishing Co. v. NLRB, 670 F.2d 464, 468 (4th Cir. 1982), we reaffirmed the rule barring the Board from "ordering agreement" on contract terms. The majority's refusal to enforce the pay remedy would therefore be correct if all Fieldcrest had done was violate its duty to bargain in good faith.

Fieldcrest, however, did more.

32

B.

The Board additionally found that Fieldcrest's creation of an unprecedented wage disparity amounted to a completely separate kind of unfair labor practice: discriminatory withholding of a "wage increase from its represented employees in order to discourage support for the Union." Fieldcrest Cannon, Inc. , 318 NLRB No. 54, at 3; see also id. at 3 n.5 ("when, as here, an employer has always treated wages on a company-wide basis and deviates from that policy during collective-bargaining negotiations in a context of statements to the effect that employees are being punished for having selected union representation, the conduct violates Sec. 8(a)(5), (3), and (1)") (concurring statement of Member Stephens). Discriminatory withholding of wages, regardless of whether those wages also are the subject of negotiation, separately violates § 8(a)(3) of the National Labor Relations Act, and the Board so found.[4] The majority has simply ignored this portion of the Board's decision.

The Board did not order Fieldcrest to grant its union employees a wage increase to redress the violation of NLRA § 8(a)(5) (breach of duty to bargain in good faith). Instead, the Board imposed the remedy to redress Fieldcrest's intentional violations of NLRA § 8(a)(3) (discrimination motivated by a desire to discourage union membership) and NLRA § 8(a)(1) (interference with protected concerted activity).[5] Indeed, the concurring opinion recognizes that Fieldcrest's aim in refusing its represented workers the wage increase it gave to unrepresented workers was "discouraging unionization at its other plants."

_____

[4] NLRA § 8(a)(3) prohibits"discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."
[5] "Protected concerted activity" means the exercise of any right guaranteed by NLRA § 7, 29 U.S.C. § 157, including:

> the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and . . . the right to refrain from any or all such activities except [with respect to certain union shop requirements, if negotiated pursuant to NLRA § 8(a)(3)].

33

Ante at 22. Creating a wage disparity with the motive of discouraging unionization is a clear violation of the National Labor Relations Act. Acme Die Casting v. NLRB, 26 F.3d 162, 166-67 (D.C. Cir. 1994); Peabody Coal Co. v. NLRB, 725 F.2d 357, 366-67 (6th Cir. 1984); Eastern Maine Medical Ctr. v. NLRB, 658 F.2d 1, 7-8 & n.4 (1st Cir. 1981); South Shore Hosp. v. NLRB, 630 F.2d 40, 44-45 (1st Cir. 1980), cert. denied, 450 U.S. 965 (1981); Parma Indus., 292 NLRB 90, 1988 WL 214278 at *1-2 (1988). "By effectively announcing to [represented workers] that they would be excluded from any increase, the [employer] . . . discredited and disparaged the Union in the eyes of its members" in violation of § 8(a)(3). Rocky Mountain Hosp., 289 NLRB No. 138, 130 L.R.R.M. 1487, 1489 (1988) (internal quotation marks omitted).**6**

The majority has not explained why an employer may shield its discriminatory conduct from Board scrutiny simply because the acts of discrimination occur contemporaneously with negotiations. The majority's decision conflicts with longstanding Fourth Circuit precedent holding that the Board may order an employer to return to its prior practices even when the union is seeking in negotiations to encourage the employer to do so. For more than twenty years it has been the law in this circuit that an employer may not persist in a practice that has been "appraised as discriminatory in itself" simply because in a negotiation session the union has sought to dissuade the employer from persisting in the unlawful practice. E.I. duPont de Nemours & Co. v. NLRB, 501 F.2d 135, 137 (4th Cir. 1974) (per curiam) (employer eliminated job-related privileges in represented units but allowed unrepresented workers to retain privileges; Board properly may order restoration of privileges and bar employer's negotiator from insisting to impasse on their elimination); NLRB v. Atlantic Int'l Corp., 664 F.2d 1231, 1233 (4th Cir. 1981) (employer unilaterally reduced wages of union workers at time when employer was seeking to negotiate a wage reduction; Board properly ordered

_____

**6** Another union, the United Textile Workers, had organized one Fieldcrest plant. Fieldcrest granted UTW-represented workers the same increase it granted unrepresented workers. Thus Fieldcrest may also have impermissibly favored one union over another, in violation of NLRA § 8(a)(2). The Board did not, however, address whether Fieldcrest violated this section.

34

restoration of wage); cf. NLRB v. Weathercraft Co., 832 F.2d 1229, 1232 (10th Cir. 1987) (Board may order remedy "restoring the economic status quo").

As in Atlantic Int'l the Board here simply ordered "a restoration of the status quo ante." Id. at 1233. Fieldcrest's prior policy was not to allow any wage disparity to exist between its union and non-union workers, but here Fieldcrest unilaterally imposed a disparity in an avowed effort to break the union and to dislodge it from the plants it had organized. If "deprivation" of a benefit in contravention of an employers' past policy of granting it "would discourage the choosing of representation by a union," the Board may order an employer to grant the benefit, regardless of whether the union is contemporaneously seeking the same benefit at the bargaining table. E.I. duPont, 501 F.2d at 136.

In both H.K. Porter and in Clearwater , by contrast, the union was asking for an unprecedented benefit. In H.K. Porter the union sought check-off (i.e., automatic deduction of union dues from employee paychecks), something the employer never had allowed in the past. In Clearwater the union demanded both check-off and a retroactive increase in pay. In this case the union simply asked the employer to follow its existing policy of maintaining equivalent wages between its union and non-union plants. The distinction between the situation presented in Clearwater and that in duPont and Atlantic Int'l is so straightforward that the Clearwater panel did not even cite duPont and Atlantic Int'l.

Today's judgment on the pay issue also puts us in conflict with the law of every other circuit that has considered the question. A circuit split should not be created "without strong cause." Mayer v. Spanel Int'l Ltd., 51 F.3d 670, 675 (7th Cir.) (Easterbrook, J.), cert. denied, 116 S. Ct. 563 (1995); accord Butler County Memorial Hosp. v. Heckler, 780 F.2d 352, 357 (3d Cir. 1985). The majority does not explain why this case is so compelling as to justify a departure from applicable precedent in this area.

In Eastern Maine the First Circuit upheld a make-whole remedy identical to the one ordered here. There the employer departed from past practices and withheld from represented workers a wage increase

35

it granted to unrepresented workers. The employer's conduct was held to violate NLRA § 8(a)(3) because the employer created the wage disparity with the intent of discouraging union membership. Eastern Maine, 658 F.2d at 9-10. The First Circuit expressly rejected the employer's defense -- identical to the defense asserted here -- "that it legitimately withheld the wage increase as an economic weapon to improve its bargaining position." Id."[A] make whole order [ ] to remedy a section 8(a)(3) violation [ ] is a standard type remedy in discrimination cases and does not exceed the Board's authority." South Shore, 630 F.2d at 45 n.7; accord Pegasus Broadcasting of San Juan, Inc. v. NLRB, 82 F.3d 511, 513 (1st Cir. 1996).

The majority's holding conflicts not only with the law of the First Circuit but also with the law of the Seventh, the Sixth, and the District of Columbia Circuits. In NLRB v. Thill, Inc., 980 F.2d 1137 (7th Cir. 1992), the employer made a pay increase retroactive for its unrepresented workers but refused to do so for its represented workers. The Board found that the employer violated § 8(a)(3), and the Seventh Circuit enforced the Board's make-whole order. Judge Posner said for the court that the "workers' entitlement to backpay cannot be doubted" even though the union had sought to negotiate wage increase retroactivity. Thill, 980 F.2d at 1141. Indeed, the court held that workers were entitled to be paid interest on the increase. Id.**7** In Peabody Coal, 725 F.2d at 366, the Sixth Circuit expressly followed the Eastern Maine rule and enforced the Board's make-whole remedy. And the District of Columbia Circuit held, in an opinion written by Judge Mikva, that where a wage increase given to unrepresented workers and denied to represented workers amounted to "a deviation from accepted prior practice" and the decision to create a wage disparity "was motivated by anti-union animus, [or by] a discriminatory desire to discourage union membership," the Board may find a § 8(a)(3) violation and order the employer to make its union employees whole by granting them the same increase. Acme Die Casting, 26 F.3d at 165-66.

_____

**7 Graphic Communications Union v. NLRB**, 977 F.2d 1168, 1171 (7th Cir. 1992), upon which the concurring opinion relies, see ante at 22, is inapposite because that case relates only to an employer's duty to disclose financial information to union negotiators. The Board did not find a § 8(a)(3) violation in that case.

The majority's holding on the pay remedy puts us at odds with our own precedent and with the law of our sister circuits. Accordingly, I respectfully dissent on that issue. Otherwise, I concur.

37